UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

JASSRY PROPERTIES LLC,

                Plaintiff,

       -against-

RAN NIZAN,

              Defendant.

------------------------------------------------------------

: 08 Civ. 00536 (JSR)
: ECF Case

## AFFIDAVIT OF DEFENDANT RAN NIZAN IN
## SUPPORT OF DEFENDANT'S MOTION TO DISMISS

STATE OF CONNECTICUT     )
                             : ss:
COUNTY OF FAIRFIELD       )

      RAN NIZAN, being duly sworn, deposes and says:

1.    I am the named defendant in this action. I am fully familiar with the facts and circumstances set forth in this affidavit, as well as the allegations set forth in the complaint filed by Plaintiff Jassry Properties LLC ("Plaintiff"). A copy of the complaint is attached as Exhibit A to this affidavit.

2.    I make this affidavit in support of my motion to dismiss for lack of personal jurisdiction, failure to join an indispensable party, and failure to state a claim upon which relief can be granted.

**THIS ACTION SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER ME.**

3.    I reside in the state of Connecticut, having a current home address at 109 Boulevard Drive, Danbury, Connecticut. I have lived in Connecticut since 1998. I have not lived or resided at any address in the state of New York since 1998.

4.    I employ no individuals and have no agents, other than my legal counsel, located or operating in the state of New York.

5.    I do not transact any business within the state of New York, nor have I contracted in other states to supply goods or services in the state of New York.

6.    I do not own, possess, use or occupy real property in the state of New York. My wife Efrat Nizan owns an apartment at 609 Columbus Avenue, New York, New York, in which I have not lived or resided since 1998 and do not have any ownership interest.

7.    The allegations of the complaint entirely refer to Lansdale Apartments LLC (the "Lansdale LLC"). The Lansdale LLC is a limited liability company organized and existing under the laws of the state of Virginia. All of its assets are located in Virginia. Attached as Exhibit B to this affidavit is a copy of a printout from the website of the Virginia State Corporation Commission showing that the Lansdale LLC is registered in Virginia as a domestic limited liability company.

8.    A copy of the operating agreement of the Lansdale LLC (the "Operating Agreement") is attached as Exhibit C to this affidavit. Sections 13.2 and 1.6 of the Operating Agreement provide that its application and interpretation shall be governed exclusively by its terms and by the laws of the State of Virginia, and specifically the Virginia Limited Liability Company Act.

9.    I personally was not served in this action. The summons and complaint in this action were brought to my attention by my attorneys.

2

10.    My attorneys informed me that counsel for plaintiff had claimed that I was properly served with the summons and complaint in this action and would seek a default judgment unless my attorneys agreed to accept service on my behalf.  In an abundance of caution, on April 2, 2008, I therefore authorized my counsel in this case, Peter M. Spett, Esq., to accept service on my behalf without waiver of and subject to any and all of my rights and defenses, including, without limitation, my jurisdictional defenses, which I reserved.  My counsel, Mr. Spett, informed me that he received the summons and complaint in this action by mail on May 19, 2008. Copies of the correspondence between my attorneys and counsel for plaintiff concerning service of process in this action are attached as Exhibit D to this affidavit.

11.    In summary, plaintiff is attempting to force me to defend myself in New York, a state where I have no contacts.

**IN THE EVENT, HOWEVER UNLIKELY, THAT THIS COURT REFUSES TO DISMISS THIS ACTION FOR LACK OF PERSONAL JURISDICTION, IT SHOULD DISMISS THIS ACTION FOR FAILURE TO JOIN INDISPENSABLE PARTY LANSDALE APARTMENTS LLC OR FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

12.    With regard to the claims made in this lawsuit, Plaintiff erroneously is asserting them individually and not derivatively.  I and the absent Lansdale LLC would be prejudiced by not having the Lansdale LLC as a party in this case.  Any judicial determination by this Court as to my actions with respect to the assets of the Lansdale LLC would necessarily impact the interests of the Lansdale LLC and each of the other individual Lansdale LLC members other than Plaintiff. Plaintiff does not have a direct interest to make claims with respect to the management of assets of the Lansdale LLC.  Moreover, without having the Lansdale LLC as a party in this action, I and the Lansdale LLC may face multiple lawsuits and inconsistent judicial determinations on the same allegations as those made in the complaint.  For these reasons and the others discussed in

the accompanying Memorandum of Law, the Lansdale LLC is a necessary and indispensable party to this action.

13.     As stated in the complaint, Plaintiff has not made any demands on the Lansdale LLC to bring any legal action against me. (Complaint ¶ 8). Since the claims asserted by Plaintiff belong to the Lansdale LLC and can only be made derivatively, the complaint should be dismissed for failure to state a claim upon which relief can be granted.

### DISCOVERY SHOULD BE STAYED PENDING RESOLUTION OF THIS MOTION

14.     Because I believe that my motion to dismiss has substantial grounds to be granted by this Court and that Plaintiff's claims are unmeritorious, I respectfully request a stay of discovery in this action (including Rule 26(a) Initial Disclosures) pending resolution of my motion to dismiss in order to avoid unnecessary expense.

15.     I submit that I will promptly and in good faith cooperate with all discovery should this Court see fit to deny my motion to dismiss.

WHEREFORE, based upon the foregoing I respectfully request this Court stay discovery in this action pending resolution of my motion to dismiss, and grant an Order:

A.     Dismissing Plaintiff's complaint in its entirety based upon lack of personal jurisdiction; or

B.     In the alternative, dismissing Plaintiff's complaint in its entirety for failure to join an indispensable party; or

C.     In the alternative, dismissing Plaintiff's complaint in its entirety for failure to state a claim upon which relief can be granted; and

D.     Granting such other relief as this Court may deem just and proper.

Dated June 4th, 2008

_____
Ran Nizan

STATE OF CONNECTICUT      )
                          : ss:
COUNTY OF FAIRFIELD       )

On June 4th, 2008, before me personally appeared Ran Nizan, to me known, and known

to me to be the same person described in and who executed the within instrument and he

acknowledged to me that he executed the same.

_____
Notary Public

**JUNE Le SAUX**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAY 31, 2012

JUDGE RAKOFF         08 CV 00536



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASSRY PROPERTIES LLC,                :        Index No. '08 C

                    Plaintiff,        :        **COMPLAINT**

         -against-                    :

RAN NIZAN,                            :

_____      :
                    Defendant .  :             **PLAINTIFF DEMANDS JURY TRIAL**

        Plaintiff JASSRY PROPERTIES LLC ("Jassry"), by its attorneys The Abramson

Law Group, PLLC, for its Complaint against defendant Ran Nizan ("Nizan"), alleges:

                    PARTIES AND JURISDICTION:

        1.      Subject matter jurisdiction is based upon the diversity of citizenship of the

parties, 28 United States Code Section 1332, the amount in controversy being in excess of $75,000

exclusive of interest and costs.

        2.      Plaintiff Jassry is and has been at all material times a limited liability

company organized and existing under the laws of the State of Virginia, and has an office at 999

Waterside Drive, Norfolk, Virginia 23510. The members of Jassry are Joseph & Elka Shereshevsky,

residents of Virginia.

        3.      Defendant Nizan resides in the State of New York at 609 Columbus Avenue,

New York, New York 10024.

                    PRELIMINARY STATEMENT:

        4.      On or about May 25, 2001, defendant Nizan granted plaintiff Jassry a twenty

percent interest in Lansdale Apartments, LLC, owner of Lansdale Apartments at 2713 Azalea Garden

Road, Norfolk, Virginia 23513 ("Lansdale").

        5.      On only one occasion since on or about May 2001, has defendant Nizan

caused issuance of a report of the business operations of Lansdale, an IRS Form K-1. With this one exception, Nizan has failed and failed to cause Lansdale to furnish to Jassry any information with respect to this entity in which Jassry has a twenty percent equity ownership.

6.      On no occasion since on or about May, 2001, has Nizan arranged to pay Jassry any dividends or other return on its twenty percent ownership of Lansdale.

7.      Upon information and belief Nizan operates and manages and has operated and managed Lansdale as if it were his private fief in which no one else had any interest or claim all to the prejudice of the interest of plaintiff Jassry.

8.      Although plaintiff Jassry brings this action solely in its own interest, plaintiff Jassry has made no effort to have this suit brought for Lansdale by its managers because efforts to do so would be futile. Efforts would be futile because, upon information and belief, Lansdale is managed by defendant Nizan and its managers consist of Nizan or others closely allied with him who would not commence actions against himself or themselves under any circumstances nor admit to conversion to his or their personal use of the assets of Lansdale or other failures to properly manage Lansdale in the interest of all of its members, including plaintiff Jassry, as evidenced in material part by Lansdale's failure to furnish to Jassry any financial reports of any kind since Jassry became a twenty-percent owner on or about May 25, 2001, with the one exception referred to in paragraph 5, above.

9.      By reason of his position as, upon information and belief, the manager of Lansdale or the controlling person who appointed and controls those who serve as its managers, defendant Nizan owed to plaintiff Jassry the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use his utmost ability to control and manage Lansdale in a

2

fair, just, honest, and equitable manner in full compliance with all applicable laws in furtherance of

the best interests of Lansdale and its members including plaintiff Jassry and not in the furtherance

of his own personal interest or benefit.

        10.    Defendant Nizan breached his duties of loyalty and good faith to Lansdale

and its members including plaintiff Jassry by:

> a. Failing to have basic management, accounting and reporting systems in place to protect the assets of Lansdale for the benefit of all of its members rather than in the personal and private interest of defendant Nizan and to assure its compliance with applicable laws including the Internal Revenue Code and its obligations to its members including plaintiff Jassry;

> b. Causing or allowing Lansdale to conduct its business in an unsafe, imprudent and unlawful manner; and

> c. Causing and permitting application of assets of Lansdale to his personal use without an appropriate accounting to all members including plaintiff Jassry.

FOR A FIRST CLAIM FOR RELIEF

        11.    Upon information and belief, defendant Nizan has caused and allowed assets

of Lansdale to be distributed to himself without accounting to other members including plaintiff

Jassry.

        12.    As a direct consequence of this mismanagement of the financial affairs of

Lansdale by Nizan, upon information and belief, plaintiff Jassry has been deprived of its twenty-

percent share of Lansdale's distributions improperly distributed by defendant Nizan entirely to or

for the benefit of defendant Nizan and has been thereby damaged in an amount to be determined at

the trial.

FOR A SECOND CLAIM FOR RELIEF

13.     Upon information and belief, unless restrained by this court, defendant Nizan may attempt to dilute the value of plaintiff Jassry's equity interest by placing a mortgage on the apartment complex which is the sole asset of Lansdale and applying any net proceeds of that mortgage transaction to his own use.

14.     Plaintiff Jassry has no adequate remedy at law.

15.     Accordingly, to protect the interests of plaintiff Jassry it requires equitable relief including an injunction against defendant Nizan's causing any new encumbrances to be placed on Lansdale's assets, an accounting by defendant Nizan as to any and all funds or other assets of Lansdale which he has received and controls, an attachment of the funds of defendant Nizan, and appointment of a receiver of Lansdale and its assets.

REQUEST FOR RELIEF

WHEREFORE, plaintiff Jassry Properties LLC demands judgment against defendant Ran Nizan:

> For the full share applicable to plaintiff Jassry Properties LLC of the assets and revenues of Lansdale distributed to defendant Ran Nizan by which he has been unjustly enriched;

> Extraordinary equitable or injunctive relief as permitted by law and equity including an injunction against defendant Ran Nizan's causing any new encumbrances to be placed on Lansdale's assets, an accounting by defendant Ran Nizan as to any and all funds or other assets of Lansdale which he has received and controls, an attachment of the funds of defendant Ran Nizan, and appointment of a receiver of Lansdale and its assets; and

> Awarding to plaintiff Jassry Properties LLC its costs and disbursements of this action, including reasonable attorneys' fees, and accountants' and experts' fees;

4

Together with such other and further relief as this court shall deem just, equitable and proper.

Dated: New York, New York
      January 16, 2008

Thomas F. Cohen
(TFC: 9045)
of counsel to
THE ABRAMSON LAW GROUP, PLLC
Attorneys for Plaintiff Jassry Properties LLC
570 Lexington Avenue – 23rd floor
New York, New York 10022
(212) 686-4401

5

**Commonwealth
of Virginia**



**State
Corporation
Commission**

| Enter |
| Signoff |
| Help |
| Print |

```
WEB#580                           CIS                  05/28/08
TCP00096   LLCM3220          LLC DATA INQUIRY           09:58:02
     LLC ID: S048231  - 7   STATUS: 00  ACTIVE      STATUS DATE: 11/27/07
     LLC NAME: LANSDALE APARTMENTS, LLC

DATE OF FILING: 03/28/2000  PERIOD OF DURATION: 12/31/2040  INDUSTRY CODE: 00
STATE OF FILING: VA VIRGINIA              MERGER INDICATOR:
                         CONVERSION/DOMESTICATION INDICATOR:
            P R I N C I P A L   O F F I C E   A D D R E S S
     STREET:  109 BOULEVARD DR

        CITY:  DANBURY           STATE:  CT  ZIP:  06810-0000
        R E G I S T E R E D   A G E N T   I N F O R M A T I O N
     R/A NAME:  KAREN M CROWLEY
              MARCUS SANTORO & KOZAK
     STREET:  1435 CROSSWAYS BLVD STE 300

        CITY:  CHESAPEAKE          STATE:  VA  ZIP:  23320-0000
     R/A STATUS: 4 MEMBER OF VSB   EFF DATE: 04/13/04 LOC: 236  CHESAPEAKE CITY
        YEAR       FEES       PENALTY    INTEREST    BALANCE
        07        50.00       25.00
     COMMAND: [................................................
```

NOTE: Function Key usage varies depending on the Application Screen.
For specifics, refer to Function Key Documentation.

# Operating Agreement

This Agreement is entered into by and between **NORTHSTAR, LLC**, a Connecticut limited liability company, and **LANSDALE APARTMENTS CORPORATION**, a Virginia corporation.

## RECITALS.

WHEREAS, NORTHSTAR, LLC and LANSDALE APARTMENTS CORPORATION, have formed a limited liability company and filed Articles of Organization in the Office of the Clerk of the Virginia State Corporation Commission on March 28, 2000, wherein each of them is a member of said limited liability company; and

WHEREAS, the parties hereto wish to enter into this Operating Agreement to govern their interests and control in said limited liability company.

NOW, THEREFORE, parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

Section 1.1 _____ "Articles of Organization" - shall mean the Articles of Organization of LANSDALE APARTMENTS, LLC, formerly Harvard Acquisition Company, LLC, filed with the Virginia State Corporation Commission, as the same may be amended from time to time. A copy of the Articles of Organization is attached hereto as **Exhibit A**

Section 1.2 "Capital Account" as of any given date shall mean the capital contribution to the Company by a Member as adjusted up to the date in question pursuant to Article VII.

Section 1.3 "Capital Contribution" shall mean any agreed contribution to the capital of the Company in cash, property or services by a Member, whenever made. "Initial Capital distributions shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement as set forth in **Exhibit B** attached hereto.

Section 1.4 "Company Interest" shall mean with respect to each member, such Member's interest in the profits and losses of the company as set forth on **Exhibit B** attached hereto.

Section 1.5 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

Section 1.6 "Virginia Act" shall mean the Virginia Limited Liability company Act (Virginia Code of 1950, as amended,, Sections 13.1-1000, et seq.), as amended from time to time.

Section 1.7 "Company" shall refer to LANSDALE APARTMENTS, LLC.

Section 1.8 "Deficit Capital Account" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year.

Section 1.9 "Distributable Cash" means all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company:

ents on indebtedness of the company and all other sums paid to lenders;

1

KMZR 004300

d incident to the normal operation of the Company's business;

                (iii)     such Reserves as the Managers deem reasonably necessary to the

Section 1. 10         "Economic Interest" shall mean a Member's Economic Interest in the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Virginia Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

ection 1. II      "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

Section 1. 12     limited     "Entity" shall mean a general partnership, a limited partnership, a domestic or foreign liability company, a trust, an estate, an association, a corporation or any other legal or commercial  entity.

Section 1. 13         "Event of Dissociation" means an event that causes a person to cease to be a Member, as provide ...

Section 1. 14         "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

Section 1. 1 5        "Gifting Member" shall mean any Member or Economic Interest owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest.

Section 1. 16        "Majority Interest" shall mean one or more Interests of Members which taken together exceed 50% of the aggregate of all Company Interests.

Section 1, 17        "Manager" shall mean one or more managers designated in the manner provided in this Agreement.

Section 1. 18        "Member" shall mean each of the parties who execute a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members as permitted herein. To the extent a Manager has acquired a Membership Interest in the Company, said Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent said Manager has acquired such Membership Interest in the Company. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

Section 1. 19        "Membership Interest" shall mean, a Member's entire interest in the company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Virginia Act.

Section 1.20 "Net Cash Flow" shall mean the net profits or net losses as increased by the sum of:

(1) the amount of amortization, depreciation and other non-cash deductions taken in to account in computing such year's operating profits or losses-, plus
(2) reserves previously set aside in accordance with generally accepted accounting principles which have ceased to be reasonable or necessary or consistent with generally accepted accounting principals as decreased by the sum of reasonable and necessary reserves to be currently set aside for anticipated expenses as may be consistent with generally accepted accounting principles which are not taken cash payments not paid from capital Contributions the payment of which is not taken into account in computing operating profits or operating losses.

Section 1.21 "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting selected by the Managers at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

KMZR 004301

3

Section 1.22 "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

Section 1.23 "Person" shall mean an individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

ection 1.24  "Reserves" shall mean, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Managers for capital expenditures, working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the company's business.

Section 1.25 "Selling, Member" shall mean any Member or Economic Interest Owner which sells, assigns or otherwise transfers for consideration all or any portion of its Membership Interest or Economic Interest.

Section 1.26 "Transferring Member" shall collectively mean a Selling Member and a Gifting Member.

Section 1.27 "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amended or supersede such regulations.

## ARTICLE II - FORMATION OF COMPANY

The Company was formed as a limited liability company under the Virginia Act by the filing of its Articles of Organization with the Office of the Clerk of the Virginia State Corporation Commission.

## ARTICLE III - BUSINESS OF COMPANY

The sole business of the Company shall be to acquire, aequire, own, hold, maintain, and operate the multifamily rental apartments now or formerly known as (i) Lansdale Garden Apartments, consisting of seventy-six (76) apartment units, located at 2713 and 2719 Azalea Garden Road in the City of Norfolk, Virginia, and (ii) the Five Points Garden Apartments, consisting of twenty (20) apartment units, located at 1209 and 1213 Norview Avenue in the City of Norfolk, Virginia (collectively, the "Property"), together with such other activities as may be necessary and advisable in connection with the ownership of the Property. Notwithstanding anything contained herein to the contrary, the Company shall not engage in any business, and it shall have no purpose, unrelated to the Property and shall not acquire any real property or own any assets other than those related to the Property and/or otherwise in furtherance of the purposes of the Company. Title to Company assets shall be held in the Company's name.

## ARTICLE IV - NAMES AND ADDRESSES OF MEMBERS

The name and addresses of the initial Members are as set forth in Exhibit B attached o and incorporated herein by reference.

## ARTICLE V - RIGHTS AND DUTIES OF MANAGERS

3

KMZR 004302

4

Section 5.1    Management.  The business and affairs of the Company shall be managed by its Managers.  The Managers shall direct, manage and control the business of the Company to the best of their ability.  Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the companies business.  At any time when there is more than one Manager, any one Manager may exercise all of the powers delegated to the Managers herein and may take any action permitted to be taken by the Managers, unless the approval of more than one of Managers is expressly required pursuant to this Operating Agreement.

Section 5.2    Number, Identity, Tenure and Qualifications.  The Company shall initially have one (1) Manager. The initial Manager shall be: Lansdale Apartments Corporation.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote or written consent of the Members holding at least two-thirds of all Company Interests, but in no instance shall there be fewer than one manager.  Each Manager shall hold office until such Manager's successor shall have been elected and qualified or such earlier time as such Manager's may resign or be removed as provided herein.  Managers shall be elected by the affirmative vote or written consent of Members holding at least a Majority Interest.  A Manager need not be a Member.

Section 5.3    Certain Powers of Managers without limiting the generality of Section 5.1 the Managers shall have power and authority on behalf of the Company-.

(a)      To purchase liability and other insurance to protect the Company's property and business;
(b)      To hold and own any Company real and/or personal properties in the name of the Company;
(c) To invest any company funds temporarily (by way of an example but not limitation) in time deposits, short term governmental obligations, commercial paper or other investments;
(d) In behalf of the company to maintain checking accounts and to execute checks-.
(e) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds, and
(f) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Without limiting the generality of Section 5.1 upon the affirmative vote or written consent of Members holding at least three-quarters of all Company Interests the Managers shall have power and authority on behalf of the Company:

(a) To sell, mortgage or otherwise dispose of all or substantially all of the assets of the company as part of a single transaction or plan-,
(b) To acquire property from any Person as the Managers may determine-,
(c) To borrow money for the Company from banks, other lending institutions, the Managers, Members, or affiliates of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, to mortgage, hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums-,
(d) To execute in behalf of the company all instruments and documents, including, without limitation, drafts; notes and other negotiable instruments; mortgages or deeds of trust, security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property-, assignments; bills of sale-, leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary or appropriate, in the opinion of the Managers, to the business of the Company- and
(e) To enter into any and all other agreements on behalf of the company, with any other Person for any purpose, in such forms as the Managers may approve.

Unless authorized to so do by this Operating Agreement or by written authorization of a Manager or Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.  No Member (other than a Member who is also a Manager) shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

        Anything in this operating Agreement to the contrary notwithstanding, the Manager or Managing Member shall have no authority to perform any act in respect of the Company in violation of any (i) applicable laws or regulations or (ii) any agreement between the Company and HSA Wexford Bancgroup or its successors or assigns (collectively, the "Lender").

4

KMZR 004303

6

Anything herein to the contrary notwithstanding, the Company shall have no indebtedness or incur any liability other than (i) debts and liabilities for trade payables and accrued expenses incurred in the ordinary course of business of operating the Property and (ii) the loan made or to be made to the Company by HSA Wexford Bancgroup.

Section 5.4    Managers Have No Exclusive Duty to Company. The Managers shall not be required to manage the Company as the Managers' sole and exclusive function and the Managers may have other business interest and may engage in other activities in addition to those relating to the Company.

Section 5.5    Bank Accounts. The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatories thereon, unless the Managers determine otherwise. All funds of the Company shall be deposited in such checking accounts, savings accounts, time deposits, or certificates of deposit in the Company's name or shall be invested in the Company's name, in such manner as shall be designated by the Manager/Managing Member from time to time. Company funds shall not be commingled with those of any other person or entity. Company funds shall be used y the Manager/Managing Member only for the business of the Company.

Section 5.6    Company Books. In according with section 9.02 herein, the Managers shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member and Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's and Economic Interest Owner's expense.

Section 5.7    Indemnity of Managers. The Company shall indemnify the Managers from and against any claim by any third party seeking monetary damages against any such Manager arising out of such Manager's performance of the Manager's duties in good faith in accordance with Virginia Act.

Section 5.8    Resignation. Any Manager of the Company may resign at any time by giving written notice to the Members of the Company; provided, however, that Ran Nizan may not resign as Manager so long as the loan from HSA Wexford Bancgroup, Inc. is outstanding. The resignation of any Manager shall take effect upon receipt of notice thereof or at such late time as shall be specified in such notice-, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member, shall not, by itself, affect the Manger's fights as a Member and shall not constitute a withdrawal of a Member.

Section 5.9    Removal. Any Manager may be removed at any time, with or without cause, by the affirmative vote or written consent of Members holding a Majority Interest; provided, however, that Ran Nizan may not be removed as Manager so long as the loan from HSA Wexford Bancgroup, Inc. is outstanding. The removal of a Manager who is also a Member shall not, by itself, affect the Managers rights as a Member and shall not constitute a withdrawal of a Member.

Section 5. 10    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote or written consent of Members holding a Majority Interest.

Section 5. 11    Compensation of Managers. The Managers shall receive no compensation for services rendered, as such; however, from time to time the Company may enter into a Property Management Agreement with the Managers subject to the affirmative vote or written consent of Members holding a Majority Interest.

Section 5.12    Super Majority Vote. The Company shall not, without the affirmative vote of 100 percent of the Members, including the vote of an Independent Director, if any, of the Managing Member, institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

## ARTICLE VI - RIGHTS AND OBLIGATIONS OF MEMBERS

6

KMZR 004304

8

Section 6.1  Limitation of Liability Each Member's liability shall be limited as set forth in this Operating
          Agreement, the Virginia Act and other applicable law.

Section 6.2  List of Members. Upon written request of any Member, the Manager shall provide a list showing the
          names, addresses and Membership Interests and Economic interests of all Members.

Section 6.3  Approval of Sale of All Assets. The Members shall have the right, by the affirmative vote or written
          consent of Members holding at least three-quarters of all Company Interests, to approve the sale,
          mortgage, exchange or other disposition of all, or substantially all, of the Company's assets which is
          to occur as part of a single transaction or plan.

Section 6.4  Priority and Return of capital. Except as may be expressly provided in Article IX, no Member or
          Economic Interest Owner shall have priority over any other Member or Economic Interest Owner,
          either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions-,
          provided that this Section shall not apply to repayment of loans (as distinguished from Capital
          Contributions) which a Member has made to the company.

## ARTICLE VII - CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

Section 7.1        Members Capital contributions. Each Member shall contribute such cash, property or services as is
set forth in Exhibit B hereto as such Member's share of the Initial Capital Contribution.

Section 7.2        Additional Contributions Except as set forth in Section 7. 1, no member shall be required to make
any Capital Contribution. The Managers may determine from time to time that additional Capital Contributions are
necessary or appropriate in connection with the conduct of the Company's business (including without limitation,
expansion or diversification or to meet operating deficits). In such event, the Members shall have the opportunity
(but not the obligation) to participate in such additional Capital Contributions on a pro rata basis in accordance with
their Company Interests

Section 7.3        Capital Accounts.

(A) A separate Capital Account will be maintained for each Member.  In general, each Member's Capital Account
          will be:
(i) increased by:

(a) the amount of money contributed by such Member to the Company;
(b) the agreed fair market value of property or services contributed by such Member to the Company (net of
               liabilities secured by such contributed property that the Company is considered to
               assume or take subject to under Section 752 of the Code,; and
(c) allocations to such Member of Net Profits and-,

(ii) decreased by

(a) the amount of money distributed to such Member by the Company-,
(b) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such
               distributed property that such Member is considered to assume or take subject to under
               Section 752 of the Code); and
(c) allocations to the account of such Member Net Losses. Capital Accounts will be maintained in accordance with
               the requirements of 704(b) of the Code and the Treasury Regulations promulgated
               thereunder.

(B)        In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the
Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it
relates to the transferred Membership interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of
the Treasury Regulations.

(C)        Upon liquidation of the Company (or the Member's Membership Interest or Economic Interest
Owner's Economic Interest), liquidating distributions will be made in accordance with the positive capital Account
balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account

8

KMZR 004305

adjustments for the Company's taxable year during which the liquidation occurs, Liquidation proceeds will be paid within sixty days of the end of the taxable year (or, if later, within 120 days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(D)        Except as otherwise required in the Virginia Act (and subject to Section 7.1 and 7.2), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

## ARTICLE VIII ALLOCATIONS, INCOME TAX AND DISTRIBUTIONS

Section 8.1    Allocations of Profits and Losses.- The Net profits and Net Losses of the Company for each Fiscal Year will be determined in accordance with the accounting method followed by the Company for Federal income tax purposes and otherwise in accordance with good accounting procedures applied in a consistent manner, and shall be allocated to the Members in the manner determined by the Managers to reasonable reflect the Members' Interests in accordance with the percentage allocations set forth in Exhibit B attached hereto and in compliance with applicable tax law.

Section 8.2    Distribution of Net Cash Flow Except as provided in Section 7.3(c), all distributions of Net cash Flow shall be made to the Members pro rata in proportion to the respective capital Interests of the Members on the record date of such distribution. Except as provided in Section 8.4, all distributions of Net Cash Flow shall be made at such time as determined by the Manager. No Member shall have the right to demand and receive property other than cash irrespective of the nature of its Capital contribution. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 8.2.

Section 8.3    Allocation of Profits and Losses from an Extraordinary Event. Upon the happening of an Extraordinary Event, such as the sale, refinancing or condemnation of any of the Company's properties (hereinafter referred to as an "Extraordinary Event"), such profits shall be allocated to all Members in proportion to their respective membership Interest. If, upon the happening of an Extraordinary Event, the Company has a net loss, such loss shall be allocated to all Members in proportion to their respective Membership Interest.

Section 8.4  Method of Distribution         Any funds received by the Company as a result of an Extraordinary Event shall be distributed in the Following manner and priority:

(a) To the payment of all loans made by any of the Members to the Company as evidenced by one or more promissory notes.
(b) To the payment of all other debts and liabilities of the Company.
(c) To the establishment of any reserves which the Managers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.
(d) To the repayment of any loans or advances that may have been made by any of the Members to the Company, unless otherwise provided for in subsection (a) above, with interest thereon at the prime rate plus two points as established from time to time by the Citibank, N.A., of New York, but if the amount available for such repayment is insufficient, then pro rata on account thereof.
(e) The funds then remaining shall be distributed to all Members in accordance with each Member's respective Membership Interest.

Section 8.5    Allocation of Tax Credits and Other Attributes. Except as otherwise provided for in this Operating Agreement, all items of depreciation, gain, loss, deductions credit, or other tax attributes of the company for any fiscal year shall be allocated in the same percentage in which the Members share any profits and losses pursuant to this Article 8.

Section 8.6    Consent of Members to Allocation and Distribution. The methods herein above set forth by which profits and losses from operations and cash from sales are allocated are expressly consented to by each Member as an express condition of becoming a Member.

Section 8.7    Limitation Upon Distributions No distribution shah be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

9

KMZR 004306

Section 8.8    Interest On and Return of Capital Contributions. No Member shall be entitled to interest on any Capital Contribution or to return of any Capital Contribution, except as otherwise specifically provided for herein.

Section 8.9    Loans to Company. Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

Section 8.1 0    No Right to Distribution. Anything in this operating Agreement in Virginia Act to the contrary notwithstanding, no Member shall be entitled to receive any distribution of money or other property in excess of $1.00 by reason of such person's ceasing to be a Member, except

issolution of the Company, or

(ii)    upon affirmative vote or written consent of Members holding a Majority Interest.

## ARTICLE IX - ACCOUNTING. REPORTS

Section 9.1    Accounting Period. The Company's accounting period shall be the calendar year.

Section 9.2    Records. Audits and Reports. The Managers shall maintain records and accounts of all operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

(a) A current and a past list setting forth in alphabetical order the full name and last know business, residence, or mailing address of each Member, Economic Interest owner and Manager, both past and present,

(b) A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any articles of amendment have been executed,

(c) Copies of the Company's federal: state, and local income tax returns and financial statements for the three most recent years, or, if such returns or statements were not prepared for any reason, Copies of the information and statements provided to, or which should have been provided to, the members to enable them to prepare their federal, state and local tax returns for such period;

(d) Copies of the Company's current effective written Operating Agreement and all amendments thereto and copies of any written operating agreements no longer in effect,

(e) A writing setting forth the amount of cash, if any, and a statement of the agreed value of other property or services contributed by each Member and the times at which or the events upon the happening of which any additional contributions are to be made by each Member;

(f) A writing stating events, if any, upon the happening of which the Company is to be dissolved and its affairs wound up;

(g) Other writings. if any, prepared pursuant to a requirement in this Operating Agreement

Section 9.3    Returns and Other Elections. The Manager shall cause the preparation and timely filing of all returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members as soon as practical after the end of the Company's fiscal year but in any event prior to the date upon which Federal and Virginia State tax returns are required to be filed by Members. All elections permitted to be made by the company under federal or state laws shall be made by the Managers in the Managers' sole discretion, providing that the Manager shall make any tax election request by members owning a Majority Interest.

## ARTICLE X TRANSFERABILITY

Section 10. 1    General. Subject to the restrictions set forth in Section 12.2 below:

(a) Neither a Member nor an Economic Interest Owner shall have the right to:

(i)sell, assign, transfer, pledge, hypothecate, exchange or otherwise Transfer for consideration, (collectively, "sell"), or

(ii)gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy) all or any part of any Membership Interest or Economic Interest without the vote or written consent of all other Members.

10

KMZR 004307

Sep-12-2002  11:52am    From-                                           T-340   P.012/022   F-865

11

(b) In the event of either the purchase of the Selling Member's interest in the Company by a third party purchaser or the gift of an interest in the Company (including an Economic Interest), and as a condition to recognizing one or more of the effectiveness and binding nature of any such sale or gift and (subject to Section 10.2, below) substitution of a new Member as against the Company or otherwise, the remaining Members may require the Selling Member or Gifting Member and the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the remaining Members such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the remaining Members may deem necessary or desirable to-

(i)constitute such purchaser, as a Member, Donee or successor-in-interest as such
(ii)confirm that the Person desiring to acquire an interest or interests in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Operating Agreement, as the same may have been further amended (whether such Person is to be admitted as a new Member or will merely be an Economic Interest Owner)-

(iii)Preserve the Company after the completion of such sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the company is qualified, organized or does business-,
(iv)Maintain the status of the Company as a partnership for federal tax purposes-, and
(v)                     Assure compliance with any applicable state and federal laws including securities laws and          regulatio-

(c) Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article X shall be deemed effective as of the last day of the calendar month in which the remaining Members consent thereto was given.

(d)                     The Selling Member hereby indemnifies the Company and the remaining Members against any and all                       loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly
(e) A Transferring Member may gift all or any portion of its Membership Interest and Economic Interest without regard to Section 10.1 (a) subsections (i) and (ii) provided that the Donee or other successor-in-interest (collectively, "Donee") complies with section 10.1 (b) and further provided that the Donee is either the Gifting Member's spouse, former spouse, or lineal descendent (including adopted children).  In the event of the gift of all or any portion of a Gifting Member's Membership Interest or Economic Interest to one or more doneeuss who are under 25 years of age, one or more trusts shall be established to hold the gifted interest(s) for the benefit of such Donee(s) until all of the Donee(s) reach the age of at least 25 years.

Section 10.2     Transferee Not Member in Absence of Consent of Holders of Majority Interest.

(a) Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.2 hereof), if all of the Members other than the Transferring Member do not approve, by written consent, of the proposed sale or gift of The Transferring Member's Membership Interest or Economic Interest to a transferee or Donee which is not a Member immediately prior to the sale or gift, then the proposed transferee or Donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee or Donee shall be merely an Economic Interest Owner.  No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by written consent of the Members holding a Majority Interest) shall be effective unless and until written notice (including the name and address of the proposed transferee or Donee and the date of such transfer) has been provided to the Company and the non-transferring Members.

(b) Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), the Company shall purchase from the Transferring Member, and the Transferring Member shall sell to the Company for a purchase price of $100.00, all remaining rights and interest retained by the Transferring Member which immediately prior to such sale or gift were associated with the transferred Economic Interest.

11

KMZR 004308

1:

## ARTICLE XI - ADDITIONAL MEMBERS

Subject to the restrictions set forth in Section 12.2, below from the date of the formation of the Company, any person or entity acceptable to Members holding a Majority Interest by such Members' written consent may become a Member in the company either by the issuance by the Company of Membership Interests for such consideration as Members holding a Majority Interest by such Members' written consent shall determine, or as a transferee of Members Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Managers may, at their option, at the time a Member is admitted, close the Company books (as thought the Company's tax year had ended) or make pro-rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE XII - DISSOLUTION AND TERMINATION

Section 12.1    Dissolution.

(a) The Company shall be dissolved and its affairs shall be wound up upon the happening of any of the first to occur of the following:

(i) at the time specified in its Articles of Organization.,
(ii) written consent of Members holding at least two-thirds of all Company Interests.,
(iii) an Event of Dissociation of a Member ("Withdrawal Event"), unless there are at least two remaining Members and the business of the Company is continued by the written consent of all of the remaining members within 90 days after the Event of Dissociation; or

(iv)                              entry of a decree of final dissolution Virginia Act.

Each of the Members agrees promptly to consent, in writing, to continue the business of the Company upon a sale or gift either of a Member's entire Economic Interest to which all of the remaining Members do not consent within 45 days after the occurrence of such sale or gift upon a sale or gift of a Transferring Member's entire Membership Interest. Such consent shall be mailed or hand delivered to the principal place of business of the Company set forth in Section 2.3 hereof (or to such other address designated by the Managers) no later than 50 days after such Withdrawal Event or transfer by Member of such Member's entire Economic Interest or Membership Interest). The sole remedy for breach of a Member's obligation to consent to continue the business of the Company under this Section shall be money damages (and not specific performance).

(b) Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Members owning Company Interests which in the aggregate constitute not less than two- thirds of the Company Interests vote or consent in writing to dissolve the Company, then all of the Members shall agree in writing to dissolve the company as soon as possible (but in any event not more than 10 days) thereafter.

(c) As soon as possible following the occurrence of any of the events specified in this Section 12.1 effecting the dissolution of the Company, the Managers shall proceed to wind up the Company's business in accordance with the Section 45 of the Virginia Act

(d)    Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes an Event of Dissociation. Unless otherwise approved in writing by Members owning a Majority Interest, a Member who resigns (a 'Resigning Member') or whose Membership interest is otherwise terminated by virtue of an Event of Dissociation, regardless of whether such Event of Dissociation was the result of a voluntary act by such Member, shall not be entitled to receive any distributions to which such Member would not have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall become an Economic Interest owner, Damages for breach of this Section 11-1 (e) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled with.

Section 12.2        Special Restrictions.  Anything in this Agreement to the contrary notwithstanding, so long as any

12

KMZR 004309

indebtedness remains outstanding by the Company to the Lender, the Company shall not:

(a)      make any loans to the Manager or its Affiliates;

(b) except as permitted by the Lender in writing, sell, encumber (except with respect to the Lender) or otherwise dispose of all or substantially all of the properties of the Company (a sale or disposition will be deemed to be "all or substantially all of the properties of the Company" if the sale or disposition includes the Property or if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is 66 2/3% or more in value of the Company's total assets as of the end of the most recently completed Company fiscal year);

(c)      dissolve, wind-up, or liquidate the Company;

· (d)    merge, consolidate or acquire substantially all the assets of another person or entity;

(e)      change the nature of the business conducted by the Company; or

(f)      except as permitted by the Lender in writing, amend or modify this Agreement.

For purposes of this Agreement, Affiliate means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a Member. For purposes hereof, the terms "control", "controlled", or "controlling" shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the members or (y) the Company or beneficial interests of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the managing member(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

Section 12.3    No Termination Due to Member Insolvency.    The Company shall not terminate solely as a consequence of the bankruptcy, insolvency, appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of a member of the Company or a substantial part of such member's property, or assignment for the benefit of its creditors, or an admission in writing of the inability to pay its debts generally as they become due, or any similar action, of one or more of the members, so long as there remains a solvent manager of the Company.

## ARTICLE XIII - MISCELLANEOUS PROVISIONS

Section 13.1Notices.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail addressed and sent as aforesaid.

Section 13.2        Application of Virginia Law . This operating agreement, and the application of interpretation hereof shall be governed exclusively by, its terms and by the laws of the State of Virginia, and specifically the Virginia Act.

Section 13.3        Waiver of Action for Partition.        Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

Section 13 4        Amendments.  This Operating Agreement may not be amended except by the unanimous written agreement of all of the Members.

Section 13.5        Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

13

KMZR 004310

14

Section 13.6        Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

Section 13.7        Headings. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extend or intent of this Operating Agreement or any provision hereof.

Section 13.8        Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 13.9        Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 13.10       Severability. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement or the application there of shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 13.11       Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto an, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

Section 13. 12      Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

14

KMZR 004311

Sep-12-2002 11:53am From-

T-340 P.016/022 F-865

15

Section 13.13        Counterparts. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.14        Rule Against Perpetuities. . The parties hereto intend that the Rule against Perpetuities (and any similar rule of law) not be applicable to any provisions of this Operating Agreement. However, notwithstanding anything to the contrary in this operating Agreement, if any provision in this Operating Agreement would be invalid or unenforceable because of the Rule against Perpetuities or any similar rule of law but for this Section 13.14, the parties hereto hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within twenty-one years after the death of the survivor of the group composed of the initial Members who are individuals and their issue who are living on the date of this Operating Agreement and their issue if any, who are living on the effective date of this Operating Agreement.

IN WITNESS WHEREOF, the undersigned members have hereunto set their hands or caused this Amended and Restated Operating Agreement to be executed as of March 28, 2000.

NORTHSTAR, LLC

By:

Sep-12-2002  11:54am    From-

T-340    P.017/022    F-865

l,

## EXHIBIT B

### INITIAL MEMBERS

NORTH STAR, LLC -------------------------50% INTEREST
109 Boulevard Drive
Danbury, CT 06810

LANSDALE APARTMENTS CORPORATION----- 50% INTEREST
109 Boulevard Drive
Danbury, CT 06810

16

**KMZR 004313**

# PETER M. SPETT

### ATTORNEY AT LAW

235 WEST 56TH STREET • SUITE 31M
NEW YORK, NEW YORK  10019
(917) 715-3823

March 19, 2008

## VIA FACSIMILE AND FIRST CLASS MAIL

Thomas F. Cohen, Esq.
The Abramson Law Group, PLLC.
570 Lexington Avenue, 23rd Floor
New York, NY  10022

> **Re:**  **Jassry Properties LLC v. Nizan, SDNY Index No. 08 Civ. 00536**

Dear Mr. Cohen:

I am representing Ran Nizan in the above-referenced matter, and write with respect to the complaint filed in this case, which has come to our attention through a Pacer search of the SDNY docket.   As you are aware, a similar lawsuit, Shereshevsky, et al v. Nizan, SDNY Index No. 07 Civ. 9814, was initiated by your office with a summons and complaint signed by Robert Frederic Martin, Esq.  With regard to that lawsuit, I notified Mr. Martin by letter dated January 24, 2008 (enclosed herewith) that Ran Nizan does not reside at 609 Columbus Avenue, New York, NY 10024.  Despite this notification, your law office again incorrectly alleges that address as Mr. Nizan's residence in the complaint filed by Jassry Properties LLC.   As your client and Mr. Martin know full well, Mr. Nizan resides at 109 Boulevard Drive, Danbury, Connecticut.

What I informed Mr. Martin in my January 24, 2008 letter applies to the complaint filed by Jassry Properties LLC as well. The entire jurisdictional basis of plaintiff's complaint does not withstand scrutiny (in addition to other patent defects therein).

Please take note that any attempted service of process by plaintiff in this case at 609 Columbus Avenue, NY, NY is insufficient, and if you seek a default judgment based upon such insufficient service, this letter will be brought to the courts' attention.  If you pursue such frivolous action in spite of this letter, we will vigorously defend against your lawsuit and seek sanctions.  As your office agreed with respect to the Shereshevsky lawsuit, we expect that you will contact my office directly before you communicate with the court, seek any order to show cause, and/or make any motion with respect to this case.

Sincerely yours,

Peter M. Spett

cc:     Mr. Ran Nizan

# THE ABRAMSON LAW GROUP

*A PROFESSIONAL LIMITED LIABILITY COMPANY*

---

570 LEXINGTON AVENUE
23ʳᵈ FLOOR
NEW YORK, NEW YORK 10022

**THOMAS F. COHEN**
Special Counsel
Admitted in
New York and New Jersey

TELEPHONE: (212) 686-4401
FACSIMILE: (212) 686-6515
E-MAIL: tfcohen@dsalaw.net

March 26, 2008

Peter M. Spett, Esq.
235 West 56ᵗʰ Street
Suite 31M
New York, New York 10019

      Re:   <u>Jassry Properties LLC v. Nizan SDNY Case No. 08 Civ.00536</u>

Dear Mr. Spett:

      I am in receipt of your letter of March 19. As you had not appeared in this action, nor in the <u>Shereshevsky</u> action, I am according you the normal courtesy of a response to your letter.

      You are entitled to your opinion on the court's jurisdiction over your client. The process server interviewed at least one building employee at 609 Columbus Avenue who confirmed that Mr. Nizan had an apartment there. We consider it no small coincidence that an internet search disclosed that Efrat Nizan resides at the Columbus Avenue address.

      Similarly, the process server in Connecticut went to 109 Boulward Drive in Danbury. A workman who was present advised that Mr. Nizan had sold the home, and believed that he had moved somewhere in the vicinity but did not know where.

      After obtaining this information, the process server checked with the post office and was told that apparently Mr. Nizan still gets mail at 109 Boulward Drive, i.e. no forwarding address.

      As your client has otherwise made himself unavailable, we will proceed to apply for entry of a default judgment in both cases accordingly, unless you agree to accept service for Mr. Nizan.

Very truly yours,

Thomas F. Cohen

TFC:gs
Spett ltr re Nizan 03.26.08

# PETER M. SPETT
### ATTORNEY AT LAW

235 WEST 56TH STREET • SUITE 31M
NEW YORK, NEW YORK  10019
(917) 715-3823

April 2, 2008

**VIA FACSIMILE AND FIRST CLASS MAIL**

Thomas F. Cohen, Esq.
The Abramson Law Group, PLLC.
570 Lexington Avenue, 23rd Floor
New York, NY  10022

Re:    **Jasary Properties LLC v. Nizan, SDNY Index No. 08 Civ. 00536**

Dear Mr. Cohen:

In response to your letter of March 26, 2008, my client stands by all the assertions made in my previous correspondence to you in this case and to Mr. Martin in the case of Shereshevsky, et al v. Nizan, SDNY Index No. 07 Civ. 9814, including, without limitation, that he resides at 109 Boulevard Drive, Danbury, Connecticut and that he has not been properly served in either case.

Nonetheless, without waiver of and subject to any and all of my client's rights and defenses, which are reserved, my client has authorized me to accept service on his behalf for both actions.   Accordingly, you may serve the summons and complaint upon me for each of those cases, after which time we will defend against their frivolous allegations.  If you have any questions, please contact me.

Sincerely yours,

Peter M. Spett

cc:    Robert Frederic Martin, Esq.
       Mr. Ran Nizan

# THE ABRAMSON LAW GROUP
*A PROFESSIONAL LIMITED LIABILITY COMPANY*

570 LEXINGTON AVENUE
23RD FLOOR
NEW YORK, NEW YORK 10022

MITCHELL SHENKMAN
Admitted in New York

TELEPHONE: (212) 686-4401
FACSIMILE: (212) 686-6515
E-MAIL: mshenkman@dsalaw.net

May 16, 2008

Peter M. Spett, Esq.
235 West 56th Street — Suite 31M
New York, New York 10019

> Re: *Jassry Properties LLC* v. *Nizan*,
> Southern District of New York, 08 CV 00536
> *Shereshevsky* v. *Nizan*, Southern District of New
> York, 07 CV 9814

Dear Mr. Spett:

In accordance with the understanding reached pursuant to your letter to Mr. Cohen of April 2, 2008, and in the course of discussions at the pre-trial conference on May 12, 2008, we enclose copies of the Summonses and Complaints in these actions as constituting service thereof.

Sincerely yours,

Robert Frederic Martin

# THE ABRAMSON LAW GROUP
### A PROFESSIONAL LIMITED LIABILITY COMPANY

---

570 LEXINGTON AVENUE
23rd FLOOR
NEW YORK, NEW YORK 10022

TELEPHONE: (212) 686-4401
FACSIMILE: (212) 686-6515
E-MAIL: tfcohen@dsalaw.net

**THOMAS F. COHEN**
Special Counsel
Admitted in
New York and New Jersey

7 Hasadna Street, Suite 201
P.O. Box 2419 Raanana, Israel
(909) 742-2705

May 21, 2008

Peter M. Spett, Esq.
235 West 56th Street
Suite 31M
New York, New York 10019

        Re:    Jassry Properties LLC vs. Nizan
                  Civil Action No. 08 CIV00536
                  (JSR)

Dear Mr. Spett:

        Robert Martin sent you a copy of the Summons and Complaint in the above matter, on May 16. I assume you have received it. Please be advised that an initial pretrial conference has been scheduled for May 27, 2008 at 11:00 a.m. before Judge Rakoff in courtroom 14B, in the Federal Courthouse at 500 Pearl Street. I would appreciate receiving your notice of appearance in advance thereof.

                      Very truly yours,

                      Thomas F. Cohen

TFC:jf
Appel ltr re Jassry v Nizan 5.21.08