UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

| | |
|---|---|
| JASSRY PROPERTIES LLC, | :   08 Civ. 00536 (JSR) |
| Plaintiff, | :   ECF Case |
| -against- | : |
| RAN NIZAN, | : |
| Defendant. | : |

------------------------------------------------------------

## DECLARATION OF PETER M. SPETT IN
## SUPPORT OF DEFENDANT'S MOTION TO DISMISS

STATE OF NEW YORK         )
                               : ss:
COUNTY OF NEW YORK     )

      PETER M. SPETT, ESQ. hereby declares, pursuant to 28 U.S.C. § 1746 under penalties of perjury, as follows:

1.    I am attorney for the named defendant in this action.  I make this declaration in further support of defendant's motion to dismiss for lack of personal jurisdiction, and to assemble for the Court the Exhibits referenced in the Supplemental Memorandum of Law in Further Support of Defendant's Motion to Dismiss For Lack of Personal Jurisdiction accompanying this declaration.

2.    Mr. Joseph Shereshevsky was personally served with a summons on October 15, 2007 naming him, along with Amnon Cohen and others, as defendants in a lawsuit commenced by Whitestone Management, LLC, a limited liability company in which defendant is the manager, alleging <u>inter alia</u> that they looted the company.  Copies of the Summons and Return of Service filed in <u>Whitestone Management, LLC v. Wextrust Capital, LLC, et al.</u>, Index No. 2007 L

009647 (Ill. Cir. Ct., Cook Co.) (the "Illinois State Court Action"), evidencing that Joseph Shereshevsky was personally served in the Illinois State Court Action on October 15, 2007, are attached hereto as part of Exhibit A.

3.    A copy of the Appearance of counsel for Mr. Shereshevsky in the Illinois State Court Action is also attached hereto as part of Exhibit A.

4.    A copy of Defendants' Motion For Extension of Time To Answer Or Otherwise Plead filed by Mr.. Shereshevsky's counsel in the Illinois State Court Action is also attached hereto as part of Exhibit A. Paragraph 1 of that document states that "Defendant Shereshevsky was served with summons on or about October 15, 2007."

5.    A copy of the transcript of the evidentiary hearing held by the Court in this action on August 6, 2008 (the "Hearing") is attached hereto as Exhibit B.

6.    A copy of Plaintiff's Exhibit 2 admitted into evidence at the Hearing is attached hereto as Exhibit C.

7.    Copies of Defendant's Exhibits 1 and 2 (i.e., the Information and Amended Judgment of Conviction, respectively, in U.S. v. Shereshevsky, Index No. 94 Cr. 248 (S.D.N.Y.)) are attached hereto as Exhibit D. Page 2 of the Amended Judgment of Conviction states that "The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total of TIME SERVED."

8.    Copies of docket sheets for the United States District Courts for the Eastern District of Virginia and the Southern District Court of New York, respectively, in U.S. v. Shereshevsky are attached hereto as Exhibit E. Entry number 3 of the docket sheet for the United States District Court for the Eastern District of Virginia in that case states "ARREST WARRANT Returned Executed as to Joseph Shereshevsky on 3/3/99."

9.    A copy of the amended Appearance Bond and attachments thereto in <u>U.S. v.</u>
<u>Shereshevsky</u> filed with the United States District Court for the Southern District of New York is
attached hereto as Exhibit F.  The following notation appears near the bottom of the amended
Appearance Bond:

> 3/15/99
> $50,000.00 PRB COSIGNED BY 2 FRP'S; AND SECURED BY
> $1,500.00; SURRENDER OF ALL TRAVEL DOCUMENTS,
> TRAVEL RESTRICTED TO USA; PSA; (MOTHER NEED NOT
> SIGN AGAIN); WITH THE CONSENT OF THE GOVT DEFT
> MAY BE RELEASED TODAY AND MAY HAVE UNTIL 4:30
> TOMORROW TO POST THE CASH SECURITY AND TO
> OBTAIN THE SECOND COSIGNER. SO ORDERED USMJ
> BUCHWALD

10.    Attached to the amended Appearance Bond is a signature page signed by Amnon Cohen
dated 3/16/99 and acknowledged by the deputy clerk of the Court.  Also attached to the amended
appearance bond is a Receipt for Payment of $1,500.00 cash to the United States District Court
for the Southern District of New York received from Amnon Cohen with a date stamp of
03/16/99.


I declare under penalty of perjury, 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated: August 10, 2008

_____
Peter M. Spett, Esq.

| 2120 – Served | 2121 – Served | |
| 2220 – Not Served | 2221 – Not Served | |
| 2320 – Served By Mail | 2321 – Served By Mail | |
| 420 – Served By Publication | 2421 – Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 ( ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____ LAW _____ DIVISION

(Name all parties)

WHITESTONE MANAGEMENT, LLC, a Connecticut
limited liability company,                    Plaintiff,

v.

WEXTRUST CAPITAL, LLC, STEVEN BYERS, AMNON
COHEN and JOSEPH SHERESHEVSKY,    Defendants.

}

2007L009647
CALENDAR/#004
TIME 00#00
#Paid

No. _____

Jury Trial Demanded
Please Serve:  Amnon Cohen
811 Country Club Drive
Teaneck, New Jersey

### SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____ 801 _____, Chicago, Illinois 60602

❑ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

❑ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

❑ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

❑ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

❑ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

❑ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

SEP 13 2007

Atty. No.: 20007

Name: Hannafan & Hannafan, Ltd.

Atty. for: Plaintiff

Address: One East Wacker Drive, Suite 2800

ity/State/Zip: Chicago, Illinois 60601

Telephone: 312/527-0055

Service by Facsimile Transmission will be accepted at: _____

WITNESS,_____, _____

_____
Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant
or other person)

(Area Code) (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

---

*M&S at your service*
694 Kingsale Road    Suffolk, VA 23437
Phone: (888) 657-9393
**Return on Service**

| | | Cost of Service: | $75.00 |
| Plaintiff: | WHITESTONE MANAGEMENT, LLC | ID #     23327 | |
| Defendant: | WEXTRUST CAPITAL, LLC, STEVEN BYERS, AMNON COHEN & JOSEPH SHERESHEVSKY | Atty File : | |
| | | COOK COUNTY CIRCUIT LAW | |
| Served: | JOSEPH SHERESHEVSKY | Case No. 07-L-9647 | |
| | 607 E. MOWBRAY COURT | Return By: | |
| | NORFOLK, VA | | |
| Writ: | NOTICE OF MOTION & ROUTINE MOTION TO APPOINT, ROUTINE ORDER, SUMMONS, COMPLAINT & ATTACHMENTS | | |

(Rev. 4/12/01)  CCL 0530

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

WHITESTONE MANAGEMENT, LLC

                    **Plaintiff**

    v.

WEXTRUST CAPITAL, LLC, et al.

                    **Defendant**

No.  2007 L 009647

Calendar: _____

07 OCT 31  AM 11:46

## APPEARANCE

☐ **GENERAL APPEARANCE**  0900 - APPEARANCE - FEE PAID; 0909 - APPEARANCE - NO FEE; 0904 - APPEARANCE FILED - FEE WAIVED

☐ **SPECIAL AND LIMITED APPEARANCE**  0905 - SPECIAL APPEARANCE - FEE PAID
                                   0906 - SPECIAL APPEARANCE - NO FEE

☑ **JURY DEMAND**  1900 - APPEARANCE & JURY DEMAND FEE PAID; 1909 APPEARANCE & JURY DEMAND NO FEE

**The undersigned enters the appearance of:**  ☐ **Plaintiff**  ☑ **Defendant**

WexTrust Capital, LLC, Steven Byers, Amnon Cohen and Joseph Shereshevsky

                         **(INSERT LITIGANT'S NAME)**

                                         **SIGNATURE**

☑ **INITIAL COUNSEL OF RECORD**  ☐ **PRO SE**

☐ **ADDITIONAL APPEARANCE**  ☐ **SUBSTITUTE APPEARANCE**

    A copy of this appearance shall be given to all parties who have appeared and have not been found by the Court to be in default.

**ATTORNEY**

NAME:  Adrian Mendoza/Lillig & Thorsness, Ltd.

ATTORNEY FOR:  Defendants

ADDRESS:  1900 Spring Road, Suite 200

CITY/STATE/ZIP:  Oak Brook, Illinois 60523

TELEPHONE:  (630) 571-1900

INSURANCE COMPANY: _____

ATTORNEY NUMBER:  11196

**PRO SE**

NAME: _____

ADDRESS: _____

CITY/STATE/ZIP: _____

TELEPHONE: _____

INSURANCE COMPANY: _____

ATTORNEY NUMBER  99500

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| WHITESTONE MANAGEMENT, LLC,<br>a Connecticut limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>WEXTRUST CAPITAL, LLC,<br>an Illinois limited liability company,<br>STEVEN BYERS, AMNON COHEN and<br>JOSEPH SHERESHEVSKY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: 2007 L 009647<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on the 8th day of November, 2007, at 10:00 a.m. or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Dennis Burke, or any judge sitting in his place and stead, in the courtroom usually occupied by his in Room 2306 of the Richard J. Daley Center, City of Chicago, County of Cook and State of Illinois, and shall then and there present **Defendants' Motion for Extension of Time to Answer or Otherwise Plead,** a copy of which is served upon you.

Respectfully Submitted,

WEXTRUST CAPITAL, LLC, STEVEN BYERS,
AMNON COHEN and JOSEPH SHERESHEVSKY

By:_____
One of Their Attorneys

Adrian Mendoza
James M. Joyce
Elizabeth Hambrick-Stowe
Lillig & Thorsness, Ltd.
1900 Spring Road, Suite 200
Oak Brook, IL 60561
(630) 571-1900
Attorney No.: 11196

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

WHITESTONE MANAGEMENT, LLC,
a Connecticut limited liability company,

           Plaintiff,      )

   v.                 )     Case No.: 2007 L 009647
                     )

WEXTRUST CAPITAL, LLC,    )
an Illinois limited liability company,   )
STEVEN BYERS, AMNON COHEN and   )
JOSEPH SHERESHEVSKY,    )
                     )
          Defendants.   )

### DEFENDANTS' MOTION FOR EXTENSION OF TIME
### TO ANSWER OR OTHERWISE PLEAD

NOW COME the Defendants, WEXTRUST CAPITAL, LLC, STEVEN BYERS, AMNON COHEN and JOSEPH SHERESHEVSKY, by and through their attorneys, Lillig & Thorsness, Ltd., and moves this court for an extension of time to Answer or Otherwise Plead in response to the Complaint of WHITESTONE MANAGEMENT, LLC. In support of the motion, Defendants state as follows:

1. On or about September 13, 2007, Plaintiff filed an eleven-count Complaint consisting of 129 paragraphs. The Complaint contains allegations regarding events occurring over a seven year period involving multiple individuals and corporate entities. Defendant Wextrust Capital, LLC was served with summons on October 3, 2007. Defendant Byers was served with summons on October 4, 2007. Defendant Cohen was served with summons on or about October 5, 2007. Defendant Shereshevsky was served with summons on or about October 15, 2007.

2. The issues presented by the Complaint are complex and factually intensive. In order to adequately analyze the Complaint and prepare a response counsel for the Defendants requires additional time. This motion is not made for the purposes of delay or obstruction.

WHEREFORE, Defendants, Wextrust Capital, LLC, Steven Byers, Amnon Cohen and Joseph Shereshevsky, respectfully request that this court enter an order

granting them until November 29, 2007 to file an answer or responsive pleading in this case and for any further relief this court deems just and proper.

Respectfully submitted,

WEXTRUST CAPITAL, LLC, STEVEN BYERS, AMNON COHEN and JOSEPH SHERESHEVSKY

By one of their Attorneys

Adrian Mendoza
James Joyce
Elizabeth Hambrick-Stowe
Lillig & Thorsness, Ltd.
1900 Spring Road, #200
Oak Brook, Illinois 60523
(630) 571-1900
Attorney Code: 11196

2

## CERTIFICATE OF SERVICE

Adrian Mendoza, an attorney, certifies that he caused **Defendants' Motion for Extension of Time to Answer or Otherwise Plead** to be served upon:

Blake I. Hannafan
Hannafan & Hannafan, Ltd.
One East Wacker Drive
Suite 2800
Chicago, IL 60601

by depositing the same in the U.S. Mail located at 1900 Spring Road, Suite 200, Oak Brook, Illinois, 60523, with correct postage prepaid before 5:00 p.m. on this 31st day of October, 2007.

_____
Adrian Mendoza

1

886YJAS1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  JASSRY PROPERTIES,
3
4           Plaintiff,
4
5      v.                    08 Civil 536 (JSR)
5
6  RAN NIZAN,
6
7           Defendant.
7
8  -----------------------------x
8
9                           August 6, 2008
9                           4:30 p.m.
10
10
11 Before:
11
12      HON. JED S. RAKOFF,
13                           District Judge
14
15              APPEARANCES
15
16 THE ABRAMSON LAW GROUP, LLC
16 Attorneys for Plaintiff
17      570 Lexington Avenue
17      New York, New York
18 IRWIN COHEN, ESQ.,
18 ROBERT F. MARTIN, ESQ.,
19 ADINA GLASS, ESQ.,
19      Of counsel
20
21 LAW OFFICE OF PETER M. SPETT,
21 Attorney for Defendant
22      235 West 56th Street
22      New York, New York
23 PETER SPETT, ESQ.,
23      Of counsel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

886YJAS1

1          THE COURT:  The case of Jassry Properties versus Ran

2     Nizan, 08 Civil 536.

3          Counsel, identify yourselves for the record..

4          MR. COHEN:  Appearing for the plaintiff, Irwin J.

5     Cohen, 570 Lexington Avenue New York, New York.

6          Counsel also present here, your Honor, are Ms. Dina

7     Glass and Mr. Robert F. Martin.

8          MR. SPETT:  Peter Spett, Office of Peter Spett, 235

9     West 56th Street, New York, New York, for defendant Ran Nizan.

10          THE COURT:  All right.  This is an evidentiary hearing

11     related to the defendant's motion to dismiss for lack of

12     personal jurisdiction.

13          Now, my chambers received earlier this afternoon

14     something entitled plaintiffs' memorandum of law in support of

15     this personal jurisdiction of defendant and opposition to

16     dismissal of a complaint.

17          I don't recall giving permission for such a belated

18     submission, did I?

19          THE MARSHAL:  Your Honor, I --

20          THE COURT:  Did I?  Yes or no?

21          THE MARSHAL:  No, you didn't.

22          THE COURT:  No.

23          As far as I am concerned, that is a nullity if one has

24     the right to just willy-nilly confront the court at the last

25     minute with papers.  I can't read them, I'm busy conducting a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

886YJAS1

1   trial.

2       Your adversary has no reason to believe they are going

3   to be served at the last minute with a memorandum of law.

4       It's one thing, and I appreciate receiving your

5   proposed exhibits, that's fine, but the notion that without any

6   permission of the court in violation not only of my express

7   rules, which forbid this, but also common sense you bother to

8   present this simply shows to me that you have no respect for

9   the legal process.

10      (Continue on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

8860pro2

1        MR. MARTIN:  I apologize, your Honor, I -- I don't

2    believe I have ever gone for a -- really for a hearing without

3    presenting a memorandum, but I shall not do so in the future.

4        THE COURT:  No.  Had you asked, either at the time of

5    the prior hearing or by joint telephone conference any day in

6    the many days since the prior hearing, permission to present

7    this, then, of course, you would have set a reasonable time so

8    that, for example, even if you had gotten it to me yesterday, I

9    only left here at 11:00 p.m.  I could have stayed until

10    midnight and read it.

11        But to just throw it at the Court, so to speak, an

12    hour or two before a hearing, I don't know what you're your

13    referring to about your past practice, but it's time, even at

14    our mutual advanced ages, that you learn --

15        MR. SPETT:  Your Honor, may I be heard on a related

16    matter to this, please?

17        THE COURT:  Yeah, go ahead.

18        MR. SPETT:  Your Honor, this is the third strike,

19    really, of my adversary.

20        First, they -- they filed this action, not as a

21    related action to the other case before Judge Keenan, that's

22    number 1 in violation of the local rules.

23        Second, last week, I received a number of

24    correspondences to the Court in violation of your Honor's

25    individual part rules.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

5

8860pro2

1    And, third, I got surprised by this without any

2   prewarning from my adversary this morning.  And I called and

3   left a message on Mr. Martin's machine at 8:30 this morning

4   when I received these papers and said that this was in

5   violation of your part rules and the local rules for sur reply

6   to be served on me.

7    So this is really the third strike.  And the reason

8   I'm raising this now, is some of the exhibits that accompany

9   this are well beyond the scope, just by looking at them, of a

10   hearing on personal jurisdiction.  They are getting into the

11   substantive matters.  So I am afraid and concerned that they

12   are going to use this merely as a fishing expedition to help

13   their case before Judge Keenan.  Some of the exhibits are

14   related to a document before in that case.  And I don't really

15   see the place where they could just ignore local rules, when we

16   are abiding, making every effort to abide by those rules.

17    If they had called me and said that they wanted to

18   make an appearance before your Honor by telephone and asked

19   permission, I would have, of course, been available.  So, I --

20   I just want to raise that to the Court's attention.

21    THE COURT:  Well, I think it's a point well taken.

22    But, as I say, I didn't read their memo.

23    Did you electronically file that memo?

24    MR. MARTIN:  No, your Honor.

25    THE COURT:  So that's another strike.  We are up to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

6

8860pro2

1  four.

2      But I'm glad you didn't, because now, I won't have to

3  issue an order to unfile it.  It will simply be submitted to

4  the waste paper basket where it properly resides.

5      So you have not been prejudiced by my fail -- by their

6  submitting a memo, because I have not read it, and they have

7  not filed it.

8      As to exhibits, of course, if they attempt to

9  introduce an exhibit improperly, you can object at that point.

10  So I don't think you could be prejudiced there.  I haven't

11  looked at the exhibits, I'll look at them when they are

12  offered.

13      With respect to the other point you make, they are

14  with of some force.  And I think where that leaves me is the

15  following: Should there be any further violation of the rules

16  of this Court, or the laws of the United States governing

17  procedure in civil matters, the Court will entertain a motion

18  for sanctions.

19      Now, let's turn to the matter of personal

20  jurisdiction.  There was an argument made in the original

21  papers, I don't know whether it was reraised or not, since I

22  have not read the new papers, but I want to put it to rest, in

23  any event.

24      The suggestion was made by plaintiffs that the fact

25  that there was an acceptance of service of process, somehow

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

7

8860pro2

1    constituted a concession of personal jurisdiction.  That is not

2    the law.  That has never been the law.  And I don't mean to

3    continue to pick bones with plaintiff's counsel, but in all

4    honesty, anyone who had a basic first year course in civil

5    procedure would know better than that.  So I don't need to hear

6    any argument, nor receive any evidence on any notion that there

7    was somehow a consent to personal jurisdiction through the mere

8    acceptance of service of process.

9         What was an issue, and what prompted this evidentiary

10   hearing, was the question of whether or not there have been

11   negotiations that were sufficient to support personal

12   jurisdiction.

13        So, who does the plaintiff want to call, first, on

14   that issue?

15        MR. COHEN:  The plaintiff will call Mr. Joseph.

16   Shereshevsky, your Honor.

17        THE COURT:  All right.

18   Joseph Shereshevsky,

19     called as a witness by the Plaintiff,

20     having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. COHEN:

23   Q. Mr. Shereshevsky, are you familiar with the plaintiff in

24   this action?

25   A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8

8860pro2          Shereshevsky - direct

1  Q.  What's your relationship, if any, to Jassry?

2  A.  I own it.

3  Q.  Are you its sole member?

4  A.  My wife and I are members.

5  Q.  Do you know the defendant in the action, Mr. Ran Nizan?

6  A.  Yes.

7  Q.  How long have you known him?

8  A.  Approximately 10 years.

9  Q.  Do you know if he has an apartment at 609 Columbus Avenue,

10  in Manhattan?

11  A.  I was never there, but it was no secret that he had an

12  apartment at that address.

13       THE COURT:  You have the -- what's your basis for

14  knowledge?

15       THE WITNESS:  It was discussed, I mean.

16       THE COURT:  With whom?

17       THE WITNESS:  With him, with Ran Nizan.

18       THE COURT:  He said he owned it, he said he lived

19  there, what did he say?

20       THE WITNESS:  He uses it.  He never said he owns it.

21  He never said if he rents it.  But he was talking about, on a

22  couple of occasions, it was not our main topic of conversation,

23  that he got some great deal on it.

24       THE COURT:  Okay.

25       THE WITNESS:  I'm not sure if he got a great rental or

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

9

8860pro2          Shereshevsky - direct

1    great purchase but he was always boasting about it.

2    Q. How long have you known Mr. Nizan?

3    A. I told you already, approximately 10 years.

4    Q. Have you had, with the -- excluding Jassry Properties, LLC,

5    have you had any other business relationships with Mr. Nizan?

6    A. I was an employee until he went bankrupt.

7    Q. For what years?

8    A. Until he went bankrupt. I was an employee until he started

9    going out of business from approximately --

10        THE COURT: Wait, hold on a second. Employee of -- of

11   him, personally, or --

12        THE WITNESS: No.

13        THE COURT: Jassry Properties.

14        THE WITNESS: No. No, no. No, not him personally.

15   He constantly changes companies, so.

16        THE COURT: So you were an employee.

17        THE WITNESS: One time was a management company, one

18   time was NI USA, one time it was -- there was all different

19   names that kept changing every few months.

20        THE COURT: How did you first come to be his employee?

21        THE WITNESS: I met him through a mutual friend,

22   Cohen, who he was partners with in 158 Madison Avenue.

23        THE COURT: And what was your role as his employee?

24        THE WITNESS: I started out selling telephone cards to

25   rentals that he had on all of his properties. And, subsequent

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

10

8860pro2                Shereshevsky - direct

1  he -- I made him aware of some people stealing money from him;

2  managers and other partners.  At that point, I was put in

3  charge of -- sort of -- my name was sort of the sheriff, the

4  inspector on properties.  Ron gave me that name.  And in a good

5  way.  And on a couple of -- eventually, it led --

6        THE COURT:  Good from your standpoint, bad from the

7  tenants, perhaps, but that's the --

8        THE WITNESS:  I meant they called me a nickname.  It

9  was okay.

10        And, at that point, I used to go around to all of the

11  properties, from the midwest until the east coast, and I

12  basically became sort of -- some sort of general manager.  And

13  I was pretty successful in raising a lot of the rent rolls

14  on --

15        THE COURT:  Through one or another of these companies,

16  did he pay you a salary?

17        THE WITNESS:  Yes.

18        THE COURT:  And approximately how much did he pay you,

19  in the last year he you worked for him.

20        THE WITNESS:  In the last year I worked for him, it

21  was -- I think, it was --

22        THE COURT:  Last full year.

23        THE WITNESS:  I think it was $35,000 a year, but it --

24        THE COURT:  All right.  What year was that?

25        THE WITNESS:  2,000.  Approximately.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

11

8860pro2                Shereshevsky - direct

1        THE COURT:  All right.  Now, what about contacts since

2    2000?

3        THE WITNESS:  Contact since 2000.  When -- when I got

4    married, he borrowed $200,000 from my wife.  My wife also paid

5    approximately $27,000 of bills on his properties, which I have

6    the canceled checks for which, he never paid me back.

7        THE COURT:  What does your wife do?

8        THE WITNESS:  My wife is a registered nurse.

9        THE COURT:  Where did she get the $200,000 dollars?

10        THE WITNESS:  She comes from an extremely wealthy

11    family.

12        THE COURT:  All right.

13        THE WITNESS:  That was given to her by her

14    grandfather.

15        THE COURT:  Okay.

16        Have you worked for him since 2000, in any capacity?

17        THE WITNESS:  I, definitely, in the year 2000, which

18    was --

19        THE COURT:  Right, but since then.

20        THE WITNESS:  No, not -- I -- I sort of -- we broke

21    off in approximately -- it may have gone into 2001 and 2002.

22        THE COURT:  All right, and the -- go ahead, Counsel.

23    BY MR. SPETT:

24    Q.  Mr. Shereshevsky, the complaint alleges a 20 percent grant

25    of an interest in Lansdale apartments by Mr. Nizan.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

12

8860pro2                    Shereshevsky - direct

1          Who participated on behalf of Jassry in the

2    negotiations for that 20 percent interest?

3    A.  I did.

4    Q.  Only you.  Anybody else on behalf of Jassry?

5    A.  My wife was also working for Nizan.  After I got married to

6    my wife.  She also was working for Nizan, managing some of

7    his --

8    Q.  But I'm talking about the negotiations for his 20 percent

9    interest.

10   A.  Well, the one who negotiated it was myself.

11         MR. COHEN:  Okay.

12         THE COURT:  And this was an apartment complex in

13   Norfolk, Virginia, is that right?

14         THE WITNESS:  Yes.  It's considered Norfolk, yes.

15         THE COURT:  And, the -- how did it come about that you

16   even were involved in negotiating an interest in that?

17         THE WITNESS:  Okay.  I introduced Ran to a good friend

18   of mine that owned the property.  Ran never knew the person

19   before.  I introduced him to this person.  They negotiated a

20   deal.  I went with Ran to the guy's office in Norfolk to

21   negotiate the deal.  I helped him negotiate the deal.  And,

22   matter of fact --

23         THE COURT:  So you were kind of, in that respect you

24   were kind of a --

25         THE WITNESS:  I was his whole connection.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

13

8860pro2                Shereshevsky - direct

1          THE COURT:  A finder, or someone at least who helped
2    put the two parties together.
3          THE WITNESS:  Correct.
4          THE COURT:  All right.  And, that was -- who was that
5    other person?
6          THE WITNESS:  The seller.
7          THE COURT:  Yeah.
8          THE WITNESS:  Name of the company is called Harbor
9    Group.
10          THE COURT:  What's the name of the company?
11          THE WITNESS:  The CEO, man by name of Jordan Sloane.
12          THE COURT:  How did you know Mr. Sloane?
13          THE WITNESS:  We pray in the same synagogue.  He is my
14    neighbor.  We, for the last ten years, we have been eating at
15    each other's homes almost every other weekend.
16          THE COURT:  Where do you live?
17          THE WITNESS:  We both live in Norfolk, Virginia.
18          THE COURT:  Okay.
19          THE WITNESS:  He is literally, to about a year ago,
20    was my next door neighbor.
21          THE COURT:  All right.  So, what happened next?
22          THE WITNESS:  So I introduced Ran to Jordan.  Went in
23    his office.  We negotiated his deal.
24          THE COURT:  So you must have still been on good terms
25    with Ran at this point?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

17

8860pro2                Shereshevsky - direct

1          THE COURT:  Of course there is no tabs, so one doesn't

2    know where one exhibit ends and the next one is --

3          MR. COHEN:  I have an extra set of the tabbed exhibits

4    if I could hand it up for the convenience of the Court.

5          THE WITNESS:  Excuse me, your Honor, is it possible to

6    get a drink of water?

7          THE COURT:  Yes.  Get some water, please.

8          THE DEPUTY CLERK:  Yes.

9          MR. COHEN:  I also wanted to indicate --

10         THE COURT:  I'm sorry, forgive me, let me just see

11    what number 2 is.

12         So the -- the first -- let's put this in front of the

13    witness.

14         MR. SPETT:  Your Honor, may I be heard on this for one

15    minute, please?

16         THE COURT:  Not yet.

17         MR. SPETT:  Okay.

18         THE COURT:  Put it in front of the witness, please.

19         MR. COHEN:  May I pose a simple question to him,

20    Judge?

21         THE COURT:  No.

22         MR. COHEN:  Okay.

23         THE COURT:  Now, this is the document you were just

24    referring to, right?

25         THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

14

8860pro2            Shereshevsky - direct

1        THE WITNESS:  Until the issues of the money that he

2    has not been paying me, I would like to think we would still be

3    on good terms.

4        THE COURT:  So, in any event -- so, all right.  You

5    went to the office in Norfolk.  What happened next?

6        THE WITNESS:  When Jordan shook hands with him, Ran's

7    words to Jordan was, Don't just shake hands with me, shake

8    hands with my partner, which was okay, a nice gesture from Ran.

9    But, at that point, he never offered me any partnership.  And

10   during that -- that couple of year period, I was pretty

11   successful of giving Ran and his manager, Esther Tores and a

12   husband who worked for Ran, still, all kind of ideas how to

13   raise the rent roll on a few of the properties.  And among them

14   was Lansdale.  And, I -- I --

15       THE COURT:  So was there a point in time when you were

16   given a 20 percent interest in Lansdale?

17       THE WITNESS:  Yes.

18       THE COURT:  And was that in writing or orally?

19       THE WITNESS:  Both.  First.

20       THE COURT:  Both.  First, it was orally.

21       THE WITNESS:  First it was orally, where after Ran saw

22   what I did on an apartment complex in Newport News and in

23   another apartment complex called Johnson Square, and in

24   Lansdale where, within a couple of years where I got involved,

25   the rent rolls increased between 15 and $25,000 a month.  Ran

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

15

8860pro2              Shereshevsky - direct

1  told me that he is going to give me a 20 percent interest in

2  Lansdale.

3        THE COURT:  All right.  So, as you understood it, this

4  was in response to the various services you had --

5        THE WITNESS:  Yeah, well, also --

6        THE COURT:  -- provided and facilitated.

7        THE WITNESS:  Yeah.  Because also during that time

8  period I thought I was pretty underpaid.  And I asked him.  He

9  said he can't do it now.  And while we were talking about this,

10  between me introducing him to the apartment complex and getting

11  rent rolls up in that apartment complex, and others, he told me

12  that he was going to give me a 20 percent interest in that

13  property.

14        THE COURT:  Where was he when he said that?

15        THE WITNESS:  Well, the first time he called me

16  "partner" was in Norfolk, Virginia in Jordan Sloane's office in

17  front of Jordan Sloane.

18        THE COURT:  All right.

19        THE WITNESS:  Subsequent to that, Ran and I would meet

20  on numerous occasions in Norfolk and in 158 Madison Avenue.  He

21  would come in, he owned the building in partnership with Cohen

22  and another guy, Harry, that subsequently sued him for fraud.

23        THE COURT:  Now, you say he also, at some point,

24  confirmed this 20 percent?

25        THE WITNESS:  Yeah, I mean when we --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

16

8860pro2              Shereshevsky - direct

1        THE COURT:  Excuse me.  In writing?

2        THE WITNESS:  Yes.

3        THE COURT:  And when was that?

4        THE WITNESS:  I don't remember an exact date, but I

5    think my counsel has it.

6        THE COURT:  All right.  And let me see that.

7        THE WITNESS:  It was at the time when he borrowed

8    money from my wife.

9        MR. COHEN:  Your Honor, I believe that Mr.

10   Shereshevsky is referring to exhibit 2 that was provided this

11   morning to chambers and to Mr. Spett.

12   A.  It was a document, I think, that was witnessed as well.

13       MR. SPETT:  I -- I object to this as beyond the scope.

14   You can look at it and see that it is related, not to this

15   property, but to a different property.

16       MR. COHEN:  Your Honor, in --

17       THE WITNESS:  Well, your Honor asked me if I --

18       THE COURT:  Whoa, whoa.  Wait.  Hold -- I cannot have

19   numerous people talking at once.  It will make gibberish of the

20   transcript, it will make chaos of the order of this Court.

21       Now, let me -- since whatever was handed up earlier

22   this afternoon or delivered earlier this afternoon as

23   plaintiff's proposed exhibits, which I'm looking at for the

24   first time now, are not --

25       MR. COHEN:  It's exhibit 2, your Honor, I believe.

               SOUTHERN DISTRICT REPORTERS, P.C.

                      (212) 805-0300

18

8860pro2                Shereshevsky - direct

1      THE COURT:  And, it appears to have two fax numbers at

2  the top; one is Winter Green Park.  Where is that?

3      THE WITNESS:  That's in Omaha.  I think in Omaha

4  Nebraska, I'm not sure.

5      THE COURT:  The bottom line appears to be an area 203

6  number, Mega Sound.  Where is that?

7      THE WITNESS:  Come again?

8      THE COURT:  Mega Sound.  Do you see that, second fax

9  number?  Look at the top of the page.

10      THE WITNESS:  That is a Connecticut fax number.

11      THE COURT:  So this is -- so far as the faxes are

12  concerned --

13      THE WITNESS:  Uh-huh.

14      THE COURT:  It was apparently first faxed to

15  Connecticut and then faxed to Omaha, yes?

16      THE WITNESS:  I -- I wouldn't know how to derive that,

17  but I --

18      THE COURT:  Well, let me --

19      THE WITNESS:  I -- I would --

20      THE COURT:  Excuse me.  Listen to my questions.

21      You see two fax numbers at the top, do you not?

22      THE WITNESS:  Yes.

23      THE COURT:  First one, chronologically, is 4/27/2001,

24  do you see that?

25      THE WITNESS:  That's the second one, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

19

8860pro2          Shereshevsky - direct

1          THE COURT:  First one chronologically.

2          THE WITNESS:  Yes.

3          THE COURT:  Is 4/27/2001, correct?

4          THE WITNESS:  Right, yes.

5          THE COURT:  And that is 1(203)778-8479, Mega Sound,

6    correct?

7          THE WITNESS:  Yes.

8          THE COURT:  That's Connecticut, correct?

9          THE WITNESS:  Yes.

10          THE COURT:  The second one, chronologically, is

11    April 3rd, 2001.  Winter Green Park.  (402)451-4060, that is

12    Omaha?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.

15          Now, this also bears the handwritten notation, Room

16    228.  Do you know what that refers to, do you see right below

17    the 4/27/2001 fax?

18          THE WITNESS:  I don't know what that is.

19          THE COURT:  Then it has, on the second page, a

20    signature that purports to be that of Ran Nizan; right?

21          THE WITNESS:  Yes.

22          THE COURT:  With a State of Connecticut notation, yes.

23          THE WITNESS:  Yes.

24          THE COURT:  And then an unsigned line, Elka.

25          THE WITNESS:  Uh-huh.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

20

8860pro2                Shereshevsky - direct

1        THE COURT:  Who is Elka?

2        THE WITNESS:  My wife.

3        THE COURT:  Okay.  And so this is a communication, so

4    far as it appears, between Connecticut and Omaha, yes?

5        THE WITNESS:  This paper, yes.

6        THE COURT:  Yes.  All right.

7        And one other thing.  The only reference to Lansdale

8    apartments that I can see, is on the second page, paragraph 12.

9        THE WITNESS:  Thirteen.

10        THE COURT:  I'm sorry, 13, thank you very much.

11        "In addition, within 30 days of the signed agreement

12    Nizan, undertakes to amend operating statements for Midtown

13    Apartments, LLC, and Lansdale Apartments, LLC to reflect

14    Heller's 20 percent stake in both those properties.

15        So did I read that correctly?

16        THE WITNESS:  Yes, your Honor.

17        THE COURT:  Is that what you were referring to when

18    you said it was confirmed in writing?

19        THE WITNESS:  Yes.

20        THE COURT:  Was there any further writing; was there

21    amended operating statements?

22        THE WITNESS:  Never.  The only thing that was amended

23    that was in writing was this -- the reason why number 13 is in

24    here --

25        THE COURT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

21

8860pro2              Shereshevsky - direct

1    THE WITNESS: -- was because I complained to him on

2    numerous occasions why he didn't put it in writing.

3    THE COURT:  He had told it to you orally back in

4    Norfolk?

5    THE WITNESS:  Right.

6    THE COURT:  And.

7    THE WITNESS:  Confirmed in 158 Madison.

8    THE COURT:  Right.  And --

9    THE WITNESS:  And I kept asking him for it.

10    THE COURT:  All right, so --

11    THE WITNESS:  Then when he wanted to borrow the

12    $200,000 from my wife, I made him sign this document, and I

13    made him sign that he is going to amend that the only other

14    things --

15    THE COURT:  Did your wife ever sign this?

16    THE WITNESS:  I'm sure there is executed documents

17    with my wife's signature and mine.

18    THE COURT:  Okay, now --

19    MR. SPETT:  I object to that that's speculation.

20    THE COURT:  Now, the -- I think it is neither here nor

21    there, since this bears the signature of Ran Nizan.

22    Therefore, while Mr. -- well, Elka might be in a

23    position to challenge this document for nonsignature, Mr. Nizan

24    is not.

25    But I'm -- I can't understand it at all, what the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

22

8860pro2                 Shereshevsky - direct

1  nature of the objection to the receipt of this document from

2  defense counsel is, since this is a document that shows,

3  arguably, something relevant to Lansdale Apartments being

4  entered into in -- in Connecticut and Omaha.

5          MR. SPETT:  I withdraw that.  Okay.

6          THE COURT:  All right.

7          So, exhibit 2 will be received.

8          THE WITNESS:  I didn't understand your Honor's last

9  question.

10          THE COURT:  What was the last question?

11          THE WITNESS:  Your Honor asked if there was anything

12  else in writing besides this.

13          THE COURT:  I thought you said no.

14          THE WITNESS:  Oh, no.  There were two other things in

15  writing.

16          THE COURT:  Yeah.

17          THE WITNESS:  One in -- after I continued to complain

18  in approximately 2003, the same person that signed here as

19  notary public who was an employee for Ran, she sent me a K1

20  showing my 20 percent interest in Jassry Properties that was

21  filed with the IRS.  And besides which --

22          THE COURT:  Okay.

23          THE WITNESS:  -- on another piece of paper, which I

24  believe my counsel --

25          THE COURT:  You filed your returns in --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

23

8860pro2          Shereshevsky - direct

1        THE WITNESS:  In the State of Virginia.

2        THE COURT:  Yes, okay.

3        THE WITNESS:  And then on another document when Ran

4    went bankrupt, he put down in his bankruptcy, which is also a

5    document that Jassry owns 20 percent of that property, so those

6    were the two additional things in writing besides that document

7    where he --

8        THE COURT:  And where was that bankruptcy filed?

9        THE WITNESS:  I would assume in Connecticut, but I --

10       THE COURT:  All right.  So, in any event, you -- to

11    the extent -- you have no knowledge suggesting it was filed in

12    New York, do you?

13       THE WITNESS:  No.  No, no.

14       THE COURT:  No, okay.

15       THE WITNESS:  When he submitted his bankruptcy

16    document he submitted --

17       THE COURT:  Okay, so my question is this.  I

18    understand what you just said, and it's helpful and I

19    appreciate that.  I have not heard anything yet that ties any

20    of this to New York.

21       THE WITNESS:  Ran -- Ran and I met on numerous

22    occasions on 158 Madison Avenue.  And we discussed all our

23    business dealings with them; this loan, the percentages in

24    Lansdale Apartments, whatever we had between us, we would be

25    constantly in New York over that two-year period.  And whatever

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

24

8860pro2          Shereshevsky - direct

1    we had together, we would always speak about.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

25

886YJAS3                  Shereshevsky - direct

1          THE COURT:  As I understand, the agreement was first,

2    if it was an agreement at all, it's really more in the nature

3    of an unilateral grant orally made, was made in Virginia and

4    then because you wanted, quite understandably, something in

5    writing before your wife would put up this substantial amount

6    of money, there was a writing that was entered into in

7    Connecticut and Nebraska, but nothing that you told me so far

8    of substance occurred in New York.

9          THE WITNESS:  Well, whenever we would meet in New

10   York, what we would discuss about other properties and the

11   rentals and because of the dramatic increase in the rentals

12   over those years is where I negotiated how much he would give

13   me of that properties, this all happened in New York.

14          All the negotiations of how much and how much was

15   being given was always a topic that came up and we were

16   discussing the increase in rent rolls and all those

17   conversations were at 158 Madison because that's basically,

18   besides twice we ever met in Connecticut, we would either meet

19   in Virginia, when he would come visit three or four times a

20   year or six, seven, eight times a year I would meet him in New

21   York in that office which he owned.  He owned the building, he

22   owned the office.

23          THE COURT:  Well, you told me before you don't

24   actually know that, but --

25          THE WITNESS:  I know that for a fact.  He owned the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

26

886YJAS3                    Shereshevsky - direct

1   building.  I was talking about the apartment.

2        THE COURT:  Thanks.  My mistake.

3        To your knowledge, where is he now?

4        THE WITNESS:  Right there (indicating).

5        THE COURT:  Where does he reside?

6        THE WITNESS:  I haven't been in touch with him for

7   years and the last I know of I just assume it's 109 Boulevard

8   Drive in Danbury, Connecticut.

9        THE COURT:  And where do you live?

10       THE WITNESS:  I live in Norfolk, Virginia and I have a

11  resident in New York at 49 14th Avenue.

12       THE COURT:  Anything else from this witness before we

13  hear from Mr. Nizan?

14       MR. COHEN:  Yes.

15  BY THE COURT:

16  Q.  Mr. Shereshevsky, Mr. Nizan has represented that all the

17  conversations concerning this economic interest occurred

18  exclusively via telephone calls between Connecticut and

19  Virginia.

20       Are you certain of your recollection that you were

21  discussing the economic interest in Landsdale Apartments in

22  that office in New York City?

23  A.  Absolutely.  It always came up.

24  Q.  The discussions occurred during the first half of 2001, is

25  that correct?

27

886YJAS3                Shereshevsky - direct

1   A.  It was, it was an on-going conversation when we met,

2   whether it be in Connecticut, Norfolk or in New York, it was an

3   on-going conversation because I wanted it in writing and I

4   wanted to know how much.

5          As a matter of fact, the K1 was a discussion that we

6   had in the office that he owned at 158 Madison.  The whole

7   discussion that I wanted a K1 happened in that office, and he

8   will remember it clearly.

9   Q.  At the times that you allegedly were in the office with

10  Mr. Nizan at 158 Madison discussing this economic interest,

11  were there any other individuals present in that office?

12  A.  There was a whole staff, but -- it was a big office.  It

13  was on four floors, there was an elevator there and there was a

14  lot of room there, so we -- I mean, if anyone overheard, I have

15  no idea.

16  Q.  Did Mr. Nizan have his own office at this location, his own

17  office?

18  A.  I don't know.

19  Q.  When you had these conversations with respect to this

20  grant, what was your understanding that you would be receiving

21  from Mr. Nizan?

22  A.  Let me understand this.  Let me tell you, our conversations

23  were one thing, rent rolls.  Joe, get the rent rolls up, get

24  the rent rolls up.

25          Part of the --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

28

886YJAS3                    Shereshevsky - direct

1      THE COURT: You have to speak slower.

2    A. In all the conversations that we had, which were almost all

3    of them related to rent rolls, how to get the rent rolls up, we

4    were speaking about his well compensation. That was the only

5    time we would be speaking about the compensation when he kept

6    pushing with the rent rolls up. So to confine one specific

7    conversation that was specifically about that I can't do that,

8    but that was the whole body of our conversations.

9    Q. You mentioned an individual by name a short while ago, Mr.

10   Amnon Cohen.

11      Did Mr. Cohen have any relationship with Mr. Nizan in

12   2000 or 2001?

13   A. Yes.

14   Q. What was that, if you know?

15   A. He was an employee, he was a partner, he was a partner in

16   158 Madison, they were partners in that building and Ran Nizan

17   as well gave him 20 percent of Landsdale.

18   Q. At any time that you were allegedly at 158 Madison in 2000

19   or 2001, was Amnon Cohen also present?

20   A. Of course.

21   Q. To the best of your knowledge, at the times that you were

22   there and saw Mr. Cohen, was Ran Nizan also present at 158

23   Madison?

24   A. Not every single time I was in New York.

25   Q. How many times during 2000 and 2001, first half of 2001,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

29

886YJAS3              Shereshevsky - direct

1    can you proximate that you were at 158 when both Mr. Cohen and

2    Mr. Nizan were also present at 158?

3    A.  Probably 15, 20 times, and there are a whole office of

4    employees that will testify to that as well.

5         MR. SPETT:  Objection, your Honor.

6         THE COURT:  The objection is sustained, but I already

7    disregarded the statement in any event.

8         MR. COHEN:  Just one moment, your Honor.

9         THE COURT:  Yes.

10        (Pause)

11        MR. COHEN:  I have no further questions of the witness

12   at this time, your Honor.

13        THE COURT:  All right.  Cross-examination.

14   CROSS EXAMINATION

15   BY MR. SPETT:

16   Q.  Good afternoon, Mr. Shereshevsky.

17        You spent a lot of time managing these properties for

18   various entities managed by Mr. Nizan?

19   A.  Yes.

20   Q.  Any of these properties in New York?

21   A.  158 Madison, but I wasn't managing that.

22   Q.  You weren't managing that?

23   A.  No.

24   Q.  And as far as you know, 158 Madison Avenue was not owned by

25   Mr. Nizan personally?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

30

886YJAS3                Shereshevsky - cross

1  A.  Well, Ran is a very clever guy.  He has a lot of companies

2  between him and everything he owns.

3  Q.  So you don't know what entity owned 158?

4  A.  Yes, I do.  It was, it was a company that was held I think

5  part of it was A&R, part of it with a guy Perry, but I have

6  documentation that I could bring to the court.

7       THE COURT:  I take it based on your knowledge of

8  Mr. Nizan's business practices during this period that your

9  assertion is that he was the person in fact controlling that

10  location?

11       THE WITNESS:  Controlling and owning it, yes, with

12  partners.

13  BY MR. SPETT:

14  Q.  Wasn't Mr. Amnon Cohen who controlled that location?

15  A.  He had his office there.

16  Q.  Wasn't that Amnon Cohen's office?

17  A.  It was his office.  His office was there.  I said that.

18  Q.  Could Mr. Amnon Cohen have been the managing partner or

19  managing member of the owner of that office or entity?

20       MR. COHEN:  I object.  It calls for speculation.

21       THE COURT:  Since your client has indicated his

22  substantial knowledge of Mr. Nizan's business practices, if he

23  knows the answer to that or has a reasonable basis for giving a

24  belief, I will allow it.  I won't allow pure speculation.

25  A.  I never saw the operating agreement to answer you, but it

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

31

886YJAS3                Shereshevsky - cross

1    is common none that Ran Nizan owned that building.  As a matter

2    of fact --

3           THE COURT:  No, no.  You answered the question.

4    BY MR. SPETT:

5    Q.  Now, how many conversations did you have with Mr. Nizan

6    about receiving an interest in Landsdale Apartments?

7    A.  Numerous.

8    Q.  How many?

9    A.  It was brought up in almost any conversation that we had

10   relating to rent rolls over those years.

11   Q.  And it was over the period 2000, 2001?

12   A.  Definitely during those periods as well.

13   Q.  How many of those conversations were in person in New York?

14   A.  Quite a few.  I always brought it up that I wanted the

15   paperwork.

16          THE COURT:  When you say quite a few, are we

17   talking --

18          THE WITNESS:  Every time --

19          THE COURT:  No, no, wait until I finish the question.

20          THE WITNESS:  Sorry.

21          THE COURT:  Are we talking of the order of ten, are we

22   talking of the order of 50?  Give me an order of magnitude.  I

23   don't expect you to remember exactly, but give me an order of

24   magnitude.

25          THE WITNESS:  It couldn't have been more than the

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

32

886YJAS3                Shereshevsky - cross

1    times that we met and I'm saying we only met 15, 20 times at

2    that location, it can't be more than that.

3            THE COURT:  Okay.  Was it maybe half of that?

4            THE WITNESS:  It was always a topic of conversation.

5            THE COURT:  You think it was most of those times?

6            THE WITNESS:  Yes.  I kept asking him for the

7    paperwork.

8    BY MR. SPETT:

9    Q.  Now, you were managing properties in Virginia, Nebraska --

10   let's go one by one.

11           Virginia?

12   A.  Yes.

13   Q.  Nebraska?

14   A.  Yes.

15   Q.  Indiana?

16   A.  Yes.

17   Q.  Anywhere else?

18   A.  Ohio.

19   Q.  Ohio.

20   A.  West Virginia.

21   Q.  West Virginia.

22   A.  To the best of my recollection, that's pretty much it.  I

23   may be forgetting something.  If I --

24   Q.  Managing those properties involved a substantial amount of

25   your time, right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

33

886YJAS3            Shereshevsky - cross

1    A. All my time.

2    Q. All your time.

3        THE COURT:  Why did you choose to bring this lawsuit

4    in New York?

5        THE WITNESS:  Because we met on 158 Madison Avenue and

6    that's where we discussed it.

7        THE COURT:  But you could have brought this by your

8    own statement, you also had dealings about this matter in

9    Norfolk, Virginia and elsewhere, so why didn't you bring this

10   action in Norfolk, for example?

11       THE WITNESS:  I have a good relationship with this law

12   firm and I chose it here.  If I would have filed this in

13   Norfolk, I imagine they would ask me why I didn't file it in

14   New York.  I mean, you file where you do business and --

15       THE COURT:  Do you do business primarily in New York?

16       THE WITNESS:  During the time I worked for Ran?

17   That's where we would meet, but primarily I was on the road.

18   Even when I have lived in Norfolk, I was only home maybe 20

19   percent of my time, I was on the road in all these different

20   states, New York, Ohio and all these places.

21       THE COURT:  Go ahead, counselor.

22   BY MR. SPETT:

23   Q. Were there many disagreements between you and Mr. Nizan

24   during your conversations about rent rolls?

25       MR. COHEN:  Your Honor, objection.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

34

886YJAS3                Shereshevsky - cross

1      THE COURT:  Overruled.

2   A.  Repeat the question.

3   Q.  Were there any disagreements between you and Mr. Nizan

4   during these conversations about Landsdale and rent rolls?

5   A.  About all the properties in general?

6   Q.  Landsdale and rent rolls for all the properties, yes.

7   A.  Well, I could remember a couple, but when you say

8   disagreements, when you work with somebody you're going to have

9   tens of disagreements a day.

10  Q.  But negotiations imply disagreements between parties,

11  correct?

12  A.  Are you talking about rent roll conversations or

13  negotiations?  Tell me what you are talking about, because you

14  are mixing them together.

15  Q.  You are the one, sir, who combined the two together by

16  saying the rent roll conversations related to Landsdale

17  Apartments.

18  A.  When we are negotiating, but now you are asking me about

19  rent rolls.

20      THE COURT:  No, no.

21      What he wants to know is -- well, let me ask a

22  different question.

23      From the beginning, if I understand it, it was agreed

24  you would get a 20 percent interest, is that right?

25      THE WITNESS:  Not from the beginning.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

35

886YJAS3               Shereshevsky - cross

1        THE COURT:  When did that first come about?

2        THE WITNESS:  While the rent rolls were going up.

3    There were a lots of rent rolls --

4        THE COURT:  That doesn't do me any good at all.  I am

5    looking for a date.  When I say when, I don't mean an exact

6    date, when, approximately, was the determination made that you

7    would get 20 percent?

8        THE WITNESS:  Probably sometime during 2000 and 2001.

9        THE COURT:  And was this something that was

10   unilaterally offered by Mr. Nizan or did he say I'll give you

11   30 percent, I'll give you ten percent and you said no, I want

12   30 percent or something like that?

13       In other words, was this an issue in dispute or was it

14   something that he said I'll give you 20 percent and you said

15   fine?

16       THE WITNESS:  He said I'll give you 20 percent and I

17   said fine.

18       THE COURT:  Okay.

19       And where did that conversation first occur?

20       THE WITNESS:  The bulk of that conversation?

21       THE COURT:  Yes.

22       THE WITNESS:  There was one time in Virginia that he

23   called me a partner, but the bulk of that conversation I had

24   with him in 158 Madison Avenue, because that's where Amnon

25   Cohen was and he says whatever he gives me he has to give

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

36

886YJAS3                Shereshevsky - cross

1    Amnon, and that's where we discussed it primarily.

2        When he came to Virginia he will came in the morning

3    and leave in the afternoon and then we went to see some

4    properties.

5        THE COURT:  Okay, okay.

6    BY MR. SPETT:

7    Q.  When you came to New York, how did you travel here?

8    A.  I drove.

9    Q.  You drove from Virginia?

10   A.  Yes, yes.

11   Q.  And did you stay overnight?

12   A.  Sometimes I did, yes.

13   Q.  Where did you stay?

14   A.  At Amnon Cohen's house or my mother's.

15   Q.  Where is Amnon Cohen's house?

16   A.  Teaneck, New Jersey and my mother is in Brooklyn, New York.

17   Q.  Do you have any records of your travel?

18   A.  I'm sure I do.  Quite a bit.  Gas.

19       THE COURT:  You have answered the question.

20   Q.  Mr. Shereshevsky, on June 18, 2002, were you convicted of

21   conspiracy to commit bank fraud in the United States Court for

22   the Southern District of New York?

23       MR. COHEN:  Objection, your Honor.  Objection, your

24   Honor.

25       He hasn't given us any advanced notice that he would

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

37

886YJAS3                Shereshevsky - cross

1    be -- any advanced written notice that he would try to bring in

2    any type of criminal element or offenses allegedly committed by

3    Mr. Shereshevsky.

4         THE COURT:  Where do you find the requirement in a

5    hearing of this sort for advanced notice?

6         MR. COHEN:  Well, I'm looking at the rules of

7    evidence, your Honor.

8         THE COURT:  Yes, that's the place to look.

9         MR. COHEN:  609(b), the last sentence of 609(b), your

10   Honor.

11        (Pause)

12        MR. SPETT:  Your Honor, this isn't a conviction --

13        THE COURT:  That is evidence of a conviction more than

14   ten years old.

15        When is this conviction?

16        MR. SPETT:  This conviction was June 18, 2002.

17        MR. COHEN:  Your Honor, this --

18        THE COURT:  Yes.  The advanced notice is -- excuse

19   me -- is of a conviction more than ten years old.

20        MR. COHEN:  Well, this office presently knows of no

21   conviction less than ten years from today, so if there is one

22   that is being alleged by Mr. Spett, perhaps --

23        THE COURT:  The ten years is calculated from whichever

24   is later, either the date when judgment was entered or if there

25   was time served from the date the defendant was released from

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

38

886YJAS3            Shereshevsky - cross

1    prison.

2        MR. SPETT:  Your Honor, will you --

3        THE COURT:  Let me find out the facts.

4        Were you ever convicted of a crime?  Yes or no?

5        THE WITNESS:  Yes, 14 years ago.

6        THE COURT:  Fourteen years ago.  Anything since then?

7        THE WITNESS:  No.

8        THE COURT:  And what was the crime -- where was the

9    crime of which you were convicted?

10        THE WITNESS:  New York.

11        THE COURT:  A federal case or state case?

12        THE WITNESS:  There were two which was basically

13    related action.  One was a state and one was a federal.

14        THE COURT:  Did you serve any prison time for this?

15        THE WITNESS:  No, unless probation counts.

16        THE COURT:  No, I am not counting probation.

17        THE WITNESS:  No.

18        THE COURT:  So let me ask defense counsel.  He says

19    it's 14 years ago.  What is your evidence of anything more

20    recent?

21        MR. SPETT:  I can mark evidence and I will present it

22    to your Honor.

23        THE COURT:  Let me see.

24        MR. SPETT:  I would like to mark this as Defendant's

25    Exhibit 1 and 2 for identification.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

39

886YJAS3                  Shereshevsky - cross

1        (Pause)

2        THE COURT:  Let me see it first.

3        (Handing to the court)

4        (Pause)

5        Well, I think defense counsel is under a

6    misapprehension.

7        The first exhibit, which is the information which was

8    filed on May 15, 1994 charging a conspiracy to defraud

9    financial institutions, would have been in the normal course

10   dealt with long, long before 2003.

11       Now, the second document is an amended judgment that

12   was filed on October 24, 2003 and says the date of imposition

13   was June 18, 2002.  But it appears that it was simply some sort

14   of technical amendment to an earlier judgment because the

15   defendant said to have pled guilty, it says in this amended

16   judgment the date the case was concluded -- I'm sorry, the date

17   the offense was concluded was 93, but that is neither here nor

18   there.

19       But an information, common knowledge has it that an

20   information would normally be filed since that requires the

21   consent of the defendant at or about the time a guilty plea was

22   entered.

23       MR. SPETT:  Your Honor, rule --

24       THE COURT:  So one would need to see the date on the

25   unamended judgment before we could see whether Rule 609 would

40

886YJAS3                Shereshevsky - cross

1   apply.

2       MR. SPETT:  Your Honor, I have the entire file

3   certified here and also the docket sheet if that would help the

4   court.  The court can also take judicial notice of it since it

5   is in this court.

6       THE COURT:  I will take a look at it in a minute, but

7   just to move it along, there appears to have been a guilty

8   plea.  When was the guilty plea entered?

9       MR. SPETT:  Well, there was a plea agreement with the

10  guilty plea, but the actual judgment of conviction was not

11  entered until 2002, your Honor.

12      THE COURT:  Do you have the plea agreement?

13      MR. SPETT:  No, I do not.  That was under seal, your

14  Honor.

15      THE COURT:  Let me see what you have.

16      (Handing to the court)

17      (Pause)

18      The docket sheet shows the following, and I will ask

19  the witness what he can tell me about this:

20      It shows that Mr. Shereshevsky waived indictment and

21  permitted the filing of an information on May 5, 1994, was then

22  released on his own recognizance with a modest bond and

23  permission to travel abroad.

24      But then the next entry is an arrest warrant was

25  issued for him in February 1999, almost five years later.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

41

886YJAS3                    Shereshevsky - cross

1        So what happened between 94 and 99, Mr. Shereshevsky?

2        THE WITNESS:  Okay.  When I was arrested in 99 it had

3    nothing to do with a crime, it was a warrant because the

4    government wanted me to testify against somebody and instead of

5    calling me up they issued a warrant for me to appear in New

6    York.  I appeared in New York and I was released the next day

7    with no charges.

8        THE COURT:  Were you cooperating?

9        THE WITNESS:  Yes.

10       THE COURT:  Was that pursuant to an agreement?

11       THE WITNESS:  Well, the guilty plea was in 94 and in

12   case they ever needed me in that case that I would come.  They

13   didn't know I moved to Virginia.

14       THE COURT:  Well, in any event, it would appear that

15   there was, without knowing anything about the matters I can

16   just draw this by inference, not by any appropriate knowledge,

17   it would appear the defendant was in a cooperation phase

18   because there is a 2000 sealed document and then the judgment

19   is actually not imposed until -- this is the original

20   judgment -- until 2002.  At that time he is given time served,

21   time served.  If it had been someone would have absconded,

22   there is no possibility he would have received time served, so

23   everything indicates there was a consensual arrangement.

24       Now, on the other hand, that means as a technical

25   matter the judgment -- I'm not concerned about the amended

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

42

886YJAS3              Shereshevsky - cross

1   judgment but the judgment was filed in 2002, in which case

2   advanced notice would not be required pursuant to Rule 609.

3        So I will receive for what it is worth as impeachment

4   material the defendant's conviction of conspiracy in connection

5   with events occurring in 92 and early 93 relating to a bank

6   fraud, conspiracy to commit bank fraud.

7        So let me give all these documents, however, back to

8   defense counsel.

9        MR. COHEN:  Can I just note my exception to that

10  ruling, your Honor.

11       THE COURT:  I don't see any possible grounds for it,

12  but, of course, your exception is duly noted.

13       MR. SPETT:  Does the witness have a copy that has been

14  marked?  I'm sorry.

15       THE COURT:  We are not going to go into it.

16       MR. SPETT:  It is for what it is worth.

17       THE COURT:  Yes.

18       To say this is, on both sides, much ado about nothing

19  would be to glorify it.  I mean, this is ancient history under

20  any conceivable analysis.

21       The defendant needs to take a break.

22       How much more do you have on cross?

23       MR. SPETT:  I just have to check with my client.  I

24  have one or two.

25       THE COURT:  Hold on just a minute.  See if there are

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

886YJAS3                Shereshevsky - cross

1  any other questions and we will give you a break in two

2  minutes.  If you can wait for two minutes it will probably make

3  it easier.

4  BY MR. SPETT:

5  Q.  Mr. Shereshevsky, you are being sued by Mr. Nizan in

6  Illinois now?

7  A.  I'm not aware of it.

8  Q.  You are not aware that you are a defendant in Illinois?

9  A.  No.

10        THE COURT:  Anything else?

11        MR. SPETT:  No further questions.

12        THE COURT:  Anything else, recognizing your client

13  badly would like to take a break?

14        MR. COHEN:  No, I have nothing else.

15        THE COURT:  Very good.  All right.

16        We are going to give you all -- no, we will call

17  Mr. Nizan.  We might as well do that right now.  Let's get Mr.

18  Nizan on.

19        Do you have anyone else?

20        MR. COHEN:  I have a process server?

21        THE COURT:  For the issue that I have already ruled as

22  meaningless?

23        MR. COHEN:  Well, if Mr. Spett would concede that the

24  affidavit of service, which is Exhibit 4 to the papers we

25  submitted today is prima facie evidence of --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

44

886YJAS3                Shereshevsky - cross

1      THE COURT:  He is not challenging and certainly it is

2  not part of this hearing and I don't recall any challenge to

3  the service of process.

4      You and your colleagues continue to persist in the

5  notion that you presented to me in your original papers, even

6  though I expressed to you at the time supreme skepticism about

7  it, that the service of process somehow is a concession of

8  personal jurisdiction and you even went so far as to cite me

9  inapposite cases that you should have been hesitant to present

10  to the court.

11      Now, if you are calling this witness for anything

12  other than to magnify your mistake, please tell me what it is.

13      MR. COHEN:  I think not, but let me just confer with

14  my colleague.

15      THE COURT:  All right.

16      (Pause)

17      MR. COHEN:  No, we won't be pursuing this line.

18      THE COURT:  All right.  So let's call Mr. Nizan.

19  Mr. Nizan.

20      I'm sorry, sir, is there any other witness?

21      MR. COHEN:  Not for the plaintiff.

22      THE COURT:  I see another gentleman sitting there.

23      MR. COHEN:  Mr. Abramson.

24      THE COURT:  Is either side calling him?

25      MR. COHEN:  No, no, he is the principal of the law

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

45

886YJAS3                    Shereshevsky - cross

1   firm that we are associated with.

2           THE COURT:  Ah, cleaver avoiding all the comments of

3   the court by sitting in the back.

4   RAN NIZAN,

5           the defendant, called as a witness, having been duly

6           sworn, testified as follows:

7           THE COURT:  State your name for the record and spell

8   your last name.

9           THE WITNESS:  Ran Nizan, N-I-Z-A-N.

10          THE COURT:  So am I right that you had lots of

11  business dealings on various matters over the years with Mr.

12  Shereshevsky?

13          THE WITNESS:  Yes.

14          THE COURT:  Pardon?

15          THE WITNESS:  Correct, yes.

16          THE COURT:  And then there came -- and did there come

17  a time when you gave him a 20 percent in Landsdale Apartments?

18          THE WITNESS:  We were negotiating that, we were very

19  close, but we never agreed.

20          THE COURT:  I'm sorry, you are going to have to speak

21  a little bit louder.

22          THE WITNESS:  We were negotiating that, we were very

23  close, but we never agreed.

24          THE COURT:  Well, let me show you what has -- let me

25  see what we did with Exhibit 2.  It probably should be still up

46

886YJAS3              Shereshevsky - cross

1    there.

2         MR. COHEN:  Exhibit 2 you are looking for?

3         THE COURT:  Yes.

4         Show it to the witness.

5         (Handing to the witness)

6         (Pause)

7         Look at the last page of that two-page document.  Is

8    that your signature?

9         THE WITNESS:  Yes.

10        THE COURT:  And this agreement says in paragraph 13,

11   "In addition, within 30 days of this signed agreement, Nizan

12   undertakes to amend operating statements for Midtown Apartments

13   LLC and Landsdale Apartments LLC to reflect Heller's 20 percent

14   stake in both these properties."

15        Do you see that?

16        THE WITNESS:  Yes.

17        THE COURT:  Who drafted that language?

18        THE WITNESS:  Joe Heller.  At the time his name was

19   Heller.

20        THE COURT:  Spell it.

21        THE WITNESS:  H-E-L-L-E-R.

22        THE COURT:  And that is the same person as Mr.

23   Shereshevsky?

24        THE WITNESS:  Correct.

25        THE COURT:  So you had already agreed that he was

                 SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

47

886YJAS3                Shereshevsky - cross

1   going to get 20 percent; yes?

2        THE WITNESS:  I did not agree and I did not sign this

3   document.

4        THE COURT:  I thought you just told me this is your

5   signature?

6        THE WITNESS:  This is my signature, correct.

7        THE COURT:  So you did sign it?

8        THE WITNESS:  Not this document.

9        THE COURT:  Wait a minute.  You mean you didn't sign

10   the amended operating statement?

11        Exhibit 2 you signed.  You just told me that, right?

12        THE WITNESS:  No.

13        THE COURT:  No?

14        THE WITNESS:  I did not sign this document.

15        THE COURT:  So when you told me two minutes ago that

16   it was your signature you lied?

17        THE WITNESS:  It is my signature.

18        THE COURT:  How does the signature come to be there?

19        THE WITNESS:  I don't know.  I would like an

20   explanation, too.

21        THE COURT:  You think it's a forgery?

22        THE WITNESS:  Yes.

23        THE COURT:  Where is Megasound?  What is Megasound?

24        THE WITNESS:  Megasound, it's a company in Connecticut

25   that sell stationery.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

48

886YJAS3            Shereshevsky - cross

1          THE COURT:  Is it your company?

2          THE WITNESS:  Yes, I'm involved in this company.

3          THE COURT:  And were you at that office when this --

4    have you ever seen this document before?

5          THE WITNESS:  Yes.

6          THE COURT:  When did you see it for the first time?

7          THE WITNESS:  When we talked we have -- there are many

8    versions of that document and a lot of changes.  I can't tell

9    you first or last or in the middle, but there is a lot of

10   different changes of this document.

11         THE COURT:  But you think -- do you have any

12   recollection of who was in Wintergreen Park?

13         THE WITNESS:  Yes.

14         THE COURT:  Who was in Wintergreen Park?

15         THE WITNESS:  Joe Heller.

16         THE COURT:  So he was there and you were in

17   Connecticut in Megasound, correct?

18         THE WITNESS:  Correct.

19         THE COURT:  So do you dispute that this document,

20   whether or not signed by you, was faxed from your office to him

21   in April of 2001?  Isn't that right?

22         THE WITNESS:  It was faxed, correct.

23         THE COURT:  All right.

24         And the document reflects that there was already a 20

25   percent stake in both these properties; yes?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

49

886YJAS3                Shereshevsky - cross

1          THE WITNESS:  Correct.

2          THE COURT:  So you had already reached that agreement;

3    yes?

4          THE WITNESS:  No.

5          THE COURT:  In what respect had you not reached that

6    agreement?

7          THE WITNESS:  We didn't finalize the agreement.  I, I

8    definitely agreed that it will be 20 percent and we spoke about

9    it, but there were conditions to that.

10         THE COURT:  Okay.

11         So there were on-going negotiations?

12         THE WITNESS:  Correct.

13         THE COURT:  But none of those ever occurred in New

14   York?

15         THE WITNESS:  None.

16         THE COURT:  You met with him, with Mr. Shereshevsky at

17   various times in New York during this period; yes?

18         THE WITNESS:  No.

19         THE COURT:  You never met with him in New York for any

20   purpose during this period?

21         THE WITNESS:  Not in New York.

22         THE COURT:  So in the entire, let's say the entire

23   year 2000, did you ever meet with him in New York?

24         THE WITNESS:  No.

25         THE COURT:  In the entire year 2001, did you ever meet

                SOUTHERN DISTRICT REPORTERS, P.C.

                     (212) 805-0300

50

886YJAS3                Shereshevsky - cross

1   with him in New York?

2        THE WITNESS:  No.

3        THE COURT:  You had an office in New York; yes?

4        THE WITNESS:  No.

5        THE COURT:  You were in New York yourself on various

6   occasions; yes?

7        THE WITNESS:  Yes.

8        THE COURT:  How frequently?

9        THE WITNESS:  Once every two months.

10        THE COURT:  And you never met with him during any of

11   those occasions?

12        THE WITNESS:  No.

13        THE COURT:  And why are you so sure about that?

14        THE WITNESS:  We had many properties, probably 15

15   properties, and there was extensive renovations.  I never had a

16   formal meeting, I always fly to the property, meet him on the

17   property, doing inspections, going over in the property.

18        He had nothing to do in New York.  We had no business

19   for him to be there and between Virginia, Indianapolis, Ohio,

20   West Virginia, Kansas, Nebraska, he was at all these places, I

21   met him at all these places, but I did not meet him in New

22   York.

23        THE COURT:  Where do you live now?

24        THE WITNESS:  Connecticut.

25        THE COURT:  Are you in New York now from time to time

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

51

886YJAS3              Shereshevsky - cross

1   other than today, obviously?

2        THE WITNESS:  The last time I was in New York is about

3   two months, and, you know, that's -- I have no business here

4   anymore so I have no reason to come here.

5        THE COURT:  What kind of business did you have in New

6   York in 2000 and 2001?

7        THE WITNESS:  At the time Amnon Cohen and I had

8   mortgage brokerage company that Amnon was run and managed.  I

9   had no involvement and his office was at 158 Madison.

10       THE COURT:  Counsel, start with defense counsel since

11  it is his witness.

12  DIRECT EXAMINATION

13  BY MR. SPETT:

14  Q.  Mr. Nizan, what entity owned 158 Madison Avenue?

15  A.  I think it was Overlook LLC.  Overlook LLC.

16  Q.  Who was the managing member of that?

17  A.  Isaac Perry.

18       MR. COHEN:  I'm sorry, can I hear that answer again

19  read back?  I didn't get the name.

20  Q.  Can you spell the last name, please?

21  A.  Perry, P-E-R-R-Y.

22       THE COURT:  Isaac Perry.

23  Q.  And was that office rented by another entity?

24  A.  It was rented by Aspen Capital.

25  Q.  And who was managing member of Aspen Capital?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

52

886YJAS3                 Nizan - direct

1   A.  Amnon Cohen.

2   Q.  What did you do in the office when you did visit on every

3   other month?

4   A.  I met with Amnon Cohen.

5   Q.  To do what?

6   A.  We were going over new properties we finance or we buying.

7   Q.  What meetings, if any, did you have with Mr. Shereshevsky

8   concerning the 20 percent interest in Landsdale.

9   A.  When I come to the properties we may have talking about it,

10  there was negotiation, most of it over the phone, wherever he

11  was and wherever I was and we transfer faxes.

12  Q.  Were any of those meetings in New York?

13  A.  No.

14  Q.  At 158 Madison Avenue, did you have a dedicated office

15  there.

16  A.  No.

17  Q.  Did you have a telephone number in that office?

18  A.  No.

19  Q.  Did you receive any mail in that office?

20  A.  No.

21  Q.  Did you live at any time in New York?

22  A.  Yes.

23  Q.  What years did you live in New York?

24  A.  1995 till 1998.

25  Q.  And since that time have you ever lived in New York?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53

886YJAS3                Nizan - direct

1    A.  No.

2    Q.  You heard Mr. Shereshevsky testify that there were

3    substantial negotiations in New York.  Is that true?

4    A.  No.

5    Q.  Why isn't that true?

6    A.  We never met in New York.

7    Q.  Does your wife still own 609 Columbus Avenue?

8    A.  Yes.

9    Q.  How is that apartment presently being used?

10   A.  Rented.

11   Q.  Rented to a tenant?

12   A.  Yes.

13   Q.  For how long?

14   A.  Over two years.

15       MR. SPETT:  I have no further questions.

16       THE COURT:  All right.  Cross-examination.

17   CROSS EXAMINATION

18   BY MR. COHEN:

19   Q.  Mr. Nizan, if I understood you correctly in response to

20   your counsel's questions about when you had spoken to Mr.

21   Shereshevsky about Landsdale, you indicated those discussions

22   would happen either when you came to the properties and met him

23   or via the phone, but not at 158.

24       Do you recall that answer?

25   A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

54

886YJAS3                Nizan - cross

1  Q. When you come to the properties you speak to him or via the

2  phone.

3      Now, in your affidavit, Mr. Nizan, dated June 21,

4  2008, you indicated that all your conversations with Mr.

5  Shereshevsky involving the grant of interest in Landsdale

6  Apartments occurred by telephone, "While I was in Connecticut

7  and Mr. Shereshevsky was in Virginia."

8      So in your affidavit you indicate all the conversation

9  were telephonic; today you advise us that some of the

10  conversations between you and Mr. Shereshevsky about Landsdale

11  were telephonic or in person when you came to the properties.

12      Do you want to amend your statement that you swore to

13  under oath on June 21, 2008 or do you want to modify your

14  answer to your counsel's question?

15  A. My affidavit is talking specifically about the

16  negotiations. When we come to the properties and he ask me

17  about it, I said send me what you want in writing and we'll go

18  over it.

19      We never sit at table and did negotiations because we

20  focused, we had a lot of work. He picked me up at the airport

21  and always was one day trips or at the end of the day I had to

22  go, so I always put it aside.

23  Q. So is it fair to say that in your mind, you are equating

24  conversations with Mr. Shereshevsky about the Landsdale

25  property interest to be different from quote negotiations close

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

55

886YJAS3              Nizan - cross

1   quote with Mr. Shereshevsky about the Landsdale interest?

2   A. Correct.

3   Q. Mr. Nizan, you indicated that you are currently renting the

4   apartment 18R at 409 Columbus Avenue, is that correct?

5   A. Correct.

6       THE COURT: I think he said his wife, but anyway.

7       MR. COHEN: He said "we rented."

8       THE COURT: It doesn't matter. It's neither here nor

9   there.

10  BY MR. COHEN:

11  Q. Mr. Nizan, did you obtain permission from the cooperative

12  corporation to sublet that apartment?

13  A. No.

14  Q. If I told you that --

15      THE COURT: No, no, no, no, you can't testify.

16  BY MR. COHEN:

17  Q. Mr. Nizan, you indicated that you live in Connecticut, that

18  you don't live in 609 Columbus Avenue.

19      When was the last time you were at 609 Columbus Avenue

20  for any reason?

21  A. Probably two months ago.

22  Q. And on this occasion two months ago when you were at 609

23  Columbus, were you in apartment 18R?

24  A. No.

25  Q. You were just at the building?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

56

886YJAS3                Nizan - cross

1    A.  I met a friend in that address.

2    Q.  Do you have any of your personal property in apartment 18R

3    at 609 Columbus?

4    A.  Yes.

5    Q.  Can you describe to us what your possessions are in that

6    unit?

7    A.  We have the bed and we have refrigerator, we have

8    furniture, we have TV, we have phone.

9    Q.  Is the phone in your name?

10   A.  In my wife's name.

11   Q.  Is there a storage room in this building?

12   A.  No.

13   Q.  When you came to 158 Madison and met with Amnon Cohen, what

14   was the room number of the office where you met with him?

15   A.  There were no room numbers.

16   Q.  Well, what floor was the office on where you met with

17   Mr. Cohen?

18   A.  The fifth floor.

19   Q.  Was that the lobby level or did you have to go up one

20   level, one story?

21   A.  Lower level.

22   Q.  Was there -- if there was no number, was there a name on

23   the door to the office that you entered into to meet Mr. Cohen?

24   A.  I don't think he put his name on the door.

25   Q.  Well, it wouldn't necessarily have to be his name, it could

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

57

886YJAS3                Nizan - cross

1    have been any one of a hundred different names.

2         Was there any words on the door?

3    A.  I don't remember.

4    Q.  Mr. Nizan, do you know an individual named Anna Faubel.

5    A.  Yes.

6    Q.  She was the one who acknowledged your signature at page 2

7    on Plaintiff's Exhibit 2, which I think you still have in front

8    of you, is that correct?

9    A.  She was my controller and authorized over thousand

10   signatures that I did on different documents.

11   Q.  To the best of your knowledge, was she a notary public of

12   the State of Connecticut in the year 2001?

13   A.  Yes.  That's her signature, if this is the question.

14   Q.  Well, notwithstanding the fact it is her signature, did she

15   also acknowledge your signature that appears on page 2 of this

16   agreement?  Did she sign off as a notary public?

17   A.  I don't see where she is acknowledging my signature.  Can

18   you point it out, please?

19        MR. COHEN:  May I approach, your Honor, to point it

20   out?

21        THE COURT:  Yes.

22   BY MR. COHEN:

23   Q.  Here (indicating)?

24   A.  It doesn't show me that she is acknowledging my signature.

25   Q.  It is the signature of A. Faubel, beneath it on the line

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

58

886YJAS3              Nizan - cross

1  directly beneath her signature, if I can read her writing

2  correctly, it states notary public, beneath that line is

3  Fairfield County, State of Connecticut, and beneath that line

4  it appears to read, even though it is abbreviation, commission

5  expires 9/30/2005.

6       Don't you believe that is a reference of her

7  commission as a notary public?

8  A.  I have, as it stated before, signed thousands of notaries

9  and it's always written I'm a notary of the State of

10  Connecticut, notarized that so-and-so appeared before me on

11  date and date, it's not her signature.  This look like a very

12  cut and paste very bad job.

13       THE COURT:  I have to say -- of course, to my mind it

14  is something of a side show, but I have to say that now I look

15  at this more carefully, this is a very peculiar notarization,

16  if that's what it is, and it lends some credence to Mr. Nizen's

17  allegations that this is not a legitimate document.

18       But, of course, the only possible relevance of this to

19  this hearing is peripheral at best, because this document on

20  its face has nothing to do with New York so this is coming to

21  play here largely on indirect circumstantial evidence issues.

22       Let me just make sure I understand one other thing

23  about the apartment in New York owned by your wife.

24       First of all, is it owned by your wife?

25       THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

59

886YJAS3              Nizan - cross

1        THE COURT:  What is her name?

2        THE WITNESS:  Efrat, E-F-R-A-T, Nizan.

3        THE COURT:  How often is she there, to your knowledge?

4        THE WITNESS:  Very rarely.

5        THE COURT:  And was that true back in -- did she own

6    it back in 2001?

7        THE WITNESS:  Yes.

8        THE COURT:  And was she there more commonly then, the

9    same or what?

10       THE WITNESS:  She was there more commonly at the time.

11       THE COURT:  What was the purpose, if you know, of her

12   having this apartment?

13       THE WITNESS:  Now it's a rental property.

14       THE COURT:  I understand that, but originally, is this

15   so you would have a place in New York?

16       THE WITNESS:  We lived in this apartment for three

17   years and then we moved out.

18       THE COURT:  I see.  This is where you lived from 95 to

19   98?

20       THE WITNESS:  Correct.

21       THE COURT:  I see.  Then you moved to Connecticut?

22       THE WITNESS:  Correct.

23       THE COURT:  All right.

24       Do you vote in Connecticut?

25       Let me back up a step.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

60

886YJAS3            Nizan - cross

1        Do you vote?

2        THE WITNESS:  No.

3        THE COURT:  Are you a citizen?

4        THE WITNESS:  No.

5        THE COURT:  Where are you from?

6        THE WITNESS:  Israel.

7        THE COURT:  Is your wife a citizen?

8        THE WITNESS:  No.

9        THE COURT:  Is she also from Israel?

10        THE WITNESS:  Yes.

11        THE COURT:  Anything else?

12    BY MR. COHEN:

13    Q.  Mr. Nizan, you indicated that the tenant for that 158

14    office was Aspen Capital and that Mr. Amnon Cohen was the

15    managing member of Aspen Capital.

16        Were there any other owners of Aspen Capital, to the

17    best of your knowledge?

18    A.  Aspen Capital was 49 and a half owned by Amnon Cohen and 50

19    percent and a half owned by MB Holding.

20    Q.  Did you have any ownership in MB Holding?

21    A.  Yes, I believe indirect.

22    Q.  When you say indirect --

23        THE COURT:  I am going to assume, I don't think it is

24    really in dispute unless defense counsel wants to dispute it, I

25    am going to assume that Mr. Nizan had a substantial role,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

61

886YJAS3            Nizan - cross

1  albeit indirectly, in that property in New York that we are

2  referring to now.

3      Any disagreement with that?

4      MR. SPETT:  No, your Honor, he was an investor in that

5  property.

6      THE COURT:  All right.

7  BY MR. COHEN:

8  Q.  Mr. Nizan, did you file a U.S. Bankruptcy Court petition in

9  2002, case number 02-50955?

10  A.  Yes.

11      MR. COHEN:  Your Honor, I want to refer the court to

12  Plaintiff's Exhibit 1 that was submitted earlier today.

13      THE COURT:  All right.

14      MR. SPETT:  Your Honor, we are going to object to this

15  exhibit as well as it has nothing to do with personal

16  jurisdiction, it's a bankruptcy petition in Connecticut.

17      MR. COHEN:  May I reply to that, your Honor?

18      THE COURT:  Put some questions to the witness as to

19  why you think this bears on this case and I will rule

20  thereafter whether it is received or not.

21      MR. COHEN:  Okay.

22      Let the record reflect that I am --

23      THE COURT:  I want to alert counsel we are going to

24  bring this hearing to a close in five minutes and I will ask my

25  law clerk to go outside and advise counsel in the Independent

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

62

886YJAS3              Nizan - cross

1   Asset Management case that they should be in court in five

2   minutes.

3   BY MR. COHEN:

4   Q.  Mr. Nizan, with respect to the document that is in front of

5   you, is that your signature on the first page, which is

6   encaptioned certification?

7   A.  Yes.

8   Q.  If you will flip, please, to the very last page, which says

9   Amended Chapter 7, individual debtor's statement of intention,

10  is that your signature above the line that reads signature of

11  debtor?

12  A.  Yes.

13  Q.  Did you cause to have this certification filed with the

14  U.S. Bankruptcy Court in December of 2002?

15  A.  Yes.

16  Q.  Mr. Nizan, two pages from the back of this document there

17  is an attachment, attached schedule which has a whole grid of

18  boxes.  The page in front of that at number 16, where it calls

19  for the nature, location and name of business, it appears that

20  the debtor's answer to 16A was, "see attached sheet," and then

21  the following page is the grid.

22       Do you see what I am talking about?  Have you found

23  that page?

24  A.  Yes.

25  Q.  Mr. Nizan, if you note that eight down to the left column

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

63

886YJAS3                Nizan - cross

1    is the word Landsdale and 13 -- wait a minute, I'm sorry -- 11

2    down, I beg your pardon, is the word Landsdale and that is

3    seven in from the right margin is the word Jassry, okay.

4        Do you see where those two lines intersect, Jassry and

5    Landsdale, the figure 20 is on that page?

6    A.  Yes.

7    Q.  Is Jassry referred therein to your knowledge to be Jassry

8    Properties, LLC?

9        MR. SPETT:  Objection, your Honor.  It has nothing to

10    do with jurisdiction.

11        MR. COHEN:  It has much to do with personal

12    jurisdiction, because it is going to the 20 percent

13    negotiations.

14        This document, I represent, indicates Mr. Nizen's

15    acknowledgment that Landsdale had bestowed a 20 percent

16    interest to Jassry.

17        Earlier Mr. Nizan indicated that while they were

18    negotiating and kicking it around, he agreed to 20 percent, we

19    spoke about it, but we didn't finalize it.

20        Now we have a document that was filed with the U.S.

21    Bankruptcy Court --

22        THE COURT:  Excuse me.  I understand both of these

23    arguments and what you are saying in one word is that this is

24    being offered for purposes of impeachment, and it will be

25    received for that purpose.  So Exhibit 1 is received for

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

64

886YJAS3                Nizan - cross

1   purposes of impeachment.

2        MR. COHEN:  May I still solicit an answer to my

3   question from the witness as to what that figure 20 means?

4        THE COURT:  It doesn't matter what he says, it means

5   20 percent.  I understand your argument with respect to that.

6        His testimony, however, earlier was that they had

7   agreed on the 20 percent, that it was other terms that they

8   were still negotiating, so I don't really think -- again, this

9   seems to me something of a tempest in a teapot, this particular

10  aspect.

11       (Pause)

12       The exhibits doesn't need to be kept by counsel.  I'm

13  not sure whether that was an exhibit.

14       All exhibits need to be kept by counsel.

15       MR. COHEN:  Your Honor, Mr. Amnon Cohen has been

16  identified by both witnesses who testified today.  Mr. Cohen

17  was supposed to have been here and we issued a subpoena to him

18  but he was called out of state unexpected.

19       THE COURT:  I agree that his testimony could be

20  relevant, so I will leave this hearing open, provided -- I will

21  give you one more shot to produce him.

22       Now, when do you think you can do that?

23       He says there is various revisions to his bankruptcy

24  filing, but it is really not here nor there.

25       You told me earlier, did you not, that the 20 percent

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

65

886YJAS3              Nizan - cross

1   had been agreed to, it was the other terms that were still

2   being negotiated; yes?

3        THE WITNESS:  Yes.

4        THE COURT:  All right.  So you may step down.

5        (Witness excused)

6        MR. COHEN:  August 12 or 13 would be a good date.

7        THE COURT:  Is defense counsel available?

8        MR. SPETT:  Yes, your Honor.

9        THE COURT:  All right.

10       So we will set down the conclusion of this hearing for

11   August --

12       MR. SPETT:  Your Honor, before we schedule, is it

13   necessary for the defendant to be here on that day?

14       THE COURT:  No.  He is obviously welcome to be, but he

15   is not required.

16       Okay.  I can give you either August 12 at five p.m. or

17   August 13 at 3 p.m.  Which do you want?

18       MR. COHEN:  The August 13 at 3:00 o'clock, your Honor.

19       THE COURT:  All right.  Very good.

20       Now, if you can't secure his appearance on that date,

21   I'm not going to give you another shot at that, but if you can

22   we will be happy to hear from him.

23       MR. COHEN:  Okay.

24       THE COURT:  On the issue of written submissions, if

25   anyone wants to make a final, and I mean final, written

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

66

886YJAS3              Nizan - cross

1   submission on the law, you may do so in the form of a memo

2   double-spaced filed with the clerk of the court electronically

3   as well as courtesy copy delivered to counsel by no later than

4   Monday, August 11 at five p.m., not to exceed ten double-spaced

5   pages, no reply, simultaneously; either side give me anything

6   else they want, that will be the final legal submission.

7         All right.  Thank you very much.

8         We will see you then on August 13.

9         (Adjournment taken to August 13, 2008, at 3:00 o'clock

10  p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4-30-2001 1:39PM    FROM WINTERGREEN PARK 14024514060
04/27/2001  08:32    1-283-778-8479    MEGA SOUND USA

Room 228

Arbur Village P. 1
Agreement between Ran Nizan &
PAGE Joe + Elka Heller
01

This agreement dated April 25th, 2001 Between Ran Nizan ("Nizan") and Joe Heller and Elka (Collectively "Heller") whereby both parties acknowledge the following:

TAC INVESTMENT LLC

1. Nizan through ___ $ ___ owns 50% interest in Arbor Village, LLC ("Arbor") a Limited Liability Company that own title to Arbor Village Apartments ("Property"), a 184 unit apartment complex in Indianapolis, Indiana. The remaining 50% interest in Arbor are owned by ___ a ___, controlled by Shachar Shoshan OZ INVESTMENT LLC

2. Heller wishes to invest money in Property in return for equity interest in Arbor.

3. Property is presently encumbered by approximately $2,600,000 mortgage ("Mortgage") held by First Bank and Trust of Illinois.

4. In addition to Arbor, Mortgage also encumbers Property known as Oxford Terrace Apartments located at 2600 N. Parker, Indianapolis, Indiana.

5. Arbor has applied for a $4,500,000 FHA insured loan from PW funding which will pay off mortgage and provide approximately $2,500,000 of rehab money for property. The loan is in the application stages and has been neither approved nor declined. The loan is anticipated to fund in September or October of 2001.

6. Heller has wired to Arbor a total of $100,000 in cash on April __ and April __ ("Wired Money").

7. The books and records of Property are managed by Property Management Group ("PMG")

Now both parties agree on the following:

1. Heller will make a cash contribution $200,000 ("Equity Contribution") which will consist Wired Money and an additional $100,000 cash contribution. The Money will be wired within 3 business days of the signing of this agreement

2. Nizan will assign to Heller a 15% interest in Arbor

3. Heller will manage the day-to-day operations of the Property.

4. If and When Property reaches 90% economic occupancy for 3 consecutive months, Nizan will assign 10%

5. All funds of Equity Contribution and wired money will be deposited in a separate account at Cole Taylor Bank ("Account").

6. The funds from Equity Contribution can only be used for operating expenses, capital improvements and debt service of Mortgage associated with Property ("Property Expenses"). Any other use of Equity Contribution will require written consent of both parties.

7. If Nizan has spent any portion of Wired Money towards any use other than Property Expenses these funds shall be returned to Account.

8. Heller will write and sign and checks on Account. All checks in excess of $1,000 will require approval of Nizan.

9. Heller will receive a monthly profit and loss report from PMG.

10. In the event of sale or refinance of Property Heller will receive the first $200,000 in excess money above existing liens (Mortgage and other liens if any).

11. Heller not charge any interest payments to Arbor.

12. Within 30 days of the signing of this agreement, Arbor Operating Statement will be amended to reflect this agreement.
13. In Addition, within 30 days of this signed agreement, Nizan undertakes to Amend Operating Statements for Midtown Apartments, LLC and Landsdale Apartment LLC to Reflect Heller's 20% stake in both those properties.
14. Should a dispute arise concerning the interpretation of any articles of this agreement, Amnon Cohen will arbitrate those matter(s). The Arbitration shall be binding.
15. This agreement shall be ratified by Shachar _Shoshani_

Signatures and Notary

_Ran Nizan_

for Tal Investments

_Elka_

A. Faubel
Notary Public
Fairfield County, State of CT
Comm. Exp 9/30/05

_Soe_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

                    - v -                   :

JOSEPH SHERESHEVSKY,                         :        INFORMATION

                    Defendant.              :

- - - - - - - - - - - - - - - - - -X

94 CRIM. 248

JUDGE HAIGHT

Cr.

Doc #2

U.S. DISTRICT COURT
FILED
MAY 15 1994
S.D. OF N.Y.

### COUNT ONE

The United States Attorney charges:

#### The Conspiracy

1.    From in or about November 1992 through in or about
January 1993, in the Southern District of New York and elsewhere,
JOSEPH SHERESHEVSKY, the defendant, and others known and unknown to
the United States Attorney (the "co-conspirators"), unlawfully,
wilfully and knowingly did combine, conspire, confederate and agree
together and with each other to commit an offense against the
United States, to wit, a violation of Title 18, United States Code,
Section 1344.

2.    It was part and object of the conspiracy that JOSEPH
SHERESHEVSKY, the defendant, and his co-conspirators unlawfully,
wilfully and knowingly would and did execute and attempt to execute
a scheme and artifice to defraud a financial institution, to wit,
Emigrant Savings Bank, and to obtain moneys, funds, credits, assets
and other property owned by and under the custody and control of
Emigrant Savings Bank, by means of false and fraudulent pretenses,
representations, and promises, to wit, JOSEPH SHERESHEVSKY and his




co-conspirators would and did negotiate and attempt to negotiate at Emigrant Savings Bank stolen checks, which bore forged endorsements and totalled approximately $328,526, in violation of Title 18, United States Code, Section 1344.

Overt Acts

3.    In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 19, 1992, JOSEPH SHERESHEVSKY, the defendant, provided another individual with a stolen check for $168,000 drawn on a bank account of Consolidated Stores Corporation, payable to Bestform, which that individual then deposited into the Congregation Account through a Manhattan branch of Emigrant Savings Bank.

b.    On or about January 4, 1993, JOSEPH SHERESHEVSKY, the defendant, provided another individual with a stolen check for $68,020.90 drawn on a bank account of the New York Housing Authority, payable to Yasulka, Inc., which that individual then deposited into the Congregation Account through a Manhattan branch of Emigrant Savings Bank.

(Title 18, United States Code, Section 371.)

Mary Jo White
_____
MARY JO WHITE
United States Attorney

2

~~O    (8/9c) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Southern District of New York

UNITED STATES OF AMERICA

v.

JOSEPH SHERESHEVSKY

AMENDED
### JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

Case Number:    1:94CR00248-01-CSH

MARTIN J. SIEGEL, ESQ.
Defendant's Attorney

## THE DEFENDANT:

X  pleaded guilty to count(s)  1

☐  pleaded nolo contendere to count(s) _____
which was accepted by the court.

was found guilty on count(s) _____
after a plea of not guilty.

*[handwritten: AS A JUDGMENT #02 1191 ON 10/27/3]*

| Title & Section | Nature of Offense | Date Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §371 | Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. §1344 | 1/31/93 | 1 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s) _____

☐  Count(s) _____  ☐ is    are  dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec.    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

Defendant's Date of Birth  7/21/56

Defendant's USM No.:    35857-054

Defendant's Residence Address:

607 E. Mowbray Court

Norfolk, VA 23507

Defendant's Mailing Address:

SAME

June 18, 2002
Date of Imposition of Judgment

*[signature]*
Signature of Judicial Officer

CHARLES S. HAIGHT, JR., U.S.D.J.
Name and Title of Judicial Officer

October 24, 2003
Date

MICROFILM
OCT 2 7 2003    12:00 PM

*[stamp: OCT 24 2003 PH]*

AO 245B    (8/96)  Sheet 2—Imprisonment

Judgment — Page   2   of   6

DEFENDANT:        JOSEPH SHERESHEVSKY
CASE NUMBER:      1:94CR00248 -01-CSH

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total of
TIME SERVED.

DEFENDANT ADVISED OF RIGHT TO APPEAL.

☐    The court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____    ☐ a.m. ☐ p.m.    on _____ .

    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2 p.m. on _____ .

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

AO 245B    (8/96, Sheet 3—Supervised Release

|  |  | Judgment—Page _3_ of _6_ |

DEFENDANT:       JOSEPH SHERESHEVSKY
CASE NUMBER:    1:94CR00248-01-CSH

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ____TWO (2) YEARS____ .

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994*:

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

X    The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of
future substance abuse. (Check, if applicable.)

X    The defendant shall not possess a firearm as defined in 18 U.S.C. § 921. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days
of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other
acceptable reasons;

6)   the defendant shall notify the probation officer ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted
of a felony unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation
of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement
officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the
permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's
criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to
confirm the defendant's compliance with such notification requirement.

AO 245B   (o. . ) Sheet 5, Part A—Criminal Monetary Penalties

Judgment — Page ___4___ of ___6___

DEFENDANT:        JOSEPH SHERESHEVSKY
CASE NUMBER:     1:94CR00248-01-CSH

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on on Sheet 5, Part B.

|              | Assessment | Fine | Restitution |
|--------------|-----------|------|-------------|
| **Totals:** | $  50.00 | $ | $ |

☐  If applicable, restitution amount ordered pursuant to plea agreement . . . . . . . . . . . . . . . . .    $ _____

## FINE

The above fine includes costs of incarceration and/or supervision in the amount of $    $_____ .

The defendant shall pay interest on any fine more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☐  The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  The interest requirement is waived.

    ☐  The interest requirement is modified as follows:

## RESTITUTION

The determination of restitution is deferred until _____ .  An Amended Judgment in a Criminal Case will be entered after such determination.

The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name of Payee | *Total Amount of loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---------------|----------------------|------------------------------|----------------------------------------|
| Emigrant Savings Bank Att: Christopher Moran Security Department 5 East 42nd Street New York, NY 10017 | | $38,797.90 | 100% |
| **Totals:** | $ _____ | $ ___$38,797.90___ | |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B    (8/96, Sheet 5, Part B—Criminal Monetary Penalties

Judgment — Page ___5___ of ___6___

DEFENDANT:     JOSEPH SHERESHEVSKY
CASE NUMBER:     1:94CR00248-01-CSH

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A       In full immediately; or

B    X   $ _50_____ immediately, balance due (in accordance with C, D, or E); or

C    ☐   not later than _____ ; or

D    ☐   in installments to commence _____ days after the date of this judgment. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate; or

E    ☐   in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ year(s) to commence _____ days after the date of this judgment.

The defendant will be credited for all payments previously made toward any criminal monetary penalties imposed.

Special instructions regarding the payment of criminal monetary penalties:

Defendant shall make restitution payments of 15% of his gross monthly income commencing November 1, 2003.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program, are to be made as directed by the court, the probation officer, or the United States attorney.



CLOSED

U.S. District Court
Eastern District of Virginia (Newport News)

CRIMINAL DOCKET FOR CASE #: 99-M -60-ALL

USA v. Shereshevsky                              Filed: 03/04/99
Dkt# in other court: None

Case Assigned to:  Magistrate Judge James E. Bradberry

JOSEPH SHERESHEVSKY (1)          Joseph Shereshevsky
aka                              [COR LD NTC pse] [PRO SE]
Joseph Heller                    Unknown
      defendant                  Unknown,

Defendant Assigned to:  Magistrate Judge James E. Bradberry

Pending Counts:

    NONE


Terminated Counts:

    NONE



Complaints                          Disposition

complaint filed



U. S. Attorneys:

    NONE


INTERNAL USE ONLY: Proceedings include all events.
4:99m 60-ALL   USA v. Shereshevsky

CLOSED

3/4/99   --   ARREST (Rule 40)of Joseph Shereshevsky (sbai)
              [Entry date 03/10/99]

3/4/99   --   Initial appearance as to Joseph Shereshevsky  held  before
              Magistrate Judge James E. Bradberry ( 99-19.2235-.3104)
              USA appeared through: R. Bradenham, AUSA  Dft(s) appeared
              through: pro se (Defendant informed of rights.) Arrested on
              Warrant out of Southern District of New York. Deft. waived
              R40 hrg. and remanded for transport to New York. (sbai)
              [Entry date 03/10/99]

3/4/99   1    WAIVER of Rule 40 Hearings by Joseph Shereshevsky (sbai)
              [Entry date 03/10/99]

3/4/99   2    COMMITMENT to another district as to Joseph Shereshevsky (
              signeed by Magistrate Judge James E. Bradberry ) (sbai)
              [Entry date 03/10/99]

3/4/99   3    ARREST WARRANT Returned Executed as to Joseph Shereshevsky
              on 3/3/99 (sbai) [Entry date 03/10/99]

3/4/99   --   CERTIFIED COPY OF COMPLETE CASE FILE SENT TO USDC SD NY.
              (sbai) [Entry date 03/10/99]

3/4/99   --   **Case closed  as to defendants: Joseph Shereshevsky (sbai)
              [Entry date 03/10/99]

A TRUE COPY, TESTE
Norman H. Meyer, Jr.
Clerk
By:
Deputy Clerk

CLOSED

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:94-cr-00248-CSH-1

Case title: USA v. Shereshevsky

Date Filed: 05/05/1994
Date Terminated: 06/18/2002

---

Assigned to: Judge Charles S. Haight

**Defendant (1)**

**Joseph Shereshevsky**
*TERMINATED: 06/18/2002*

represented by **George Farkas**
*LEAD ATTORNEY*
*Designation: Retained*

**Meir Moza**
Meir Moza, Esq
217 Willis Avenue
Mineola, NY 11501
(516)-741-0003
Fax: (516)-741-0033
Email: memoza@optonline.net
*LEAD ATTORNEY*
*Designation: Retained*

**Pending Counts**

18:371 BANK FRAUD
(1)

**Disposition**

Imprisonment: Time served. Defendant
advised of his right to appeal.
Supervised release: 24 months. Special
assessment: $50, due in full
immediately.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

**United States Of America**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/05/1994 | 1 | WAIVER OF INDICTMENT by Joseph Shereshevsky (rag) (Entered: 05/06/1994) |
| 05/05/1994 | 2 | INFORMATION as to Joseph Shereshevsky (1) count(s) 1 (rag) (Entered: 05/06/1994) |
| 05/05/1994 | 3 | PRB BOND filed by Joseph Shereshevsky in Amount $ 50,000. Deft. allowed to travel abroad subject to weekly reporting to Pretrial Service by phone, co-signed by mother Chana Shereshevsky by 5/6/94. (rag) (Entered: 05/06/1994) |
| 02/19/1999 | 6 | Arrest WARRANT issued as to Joseph Shereshevsky (rag) (Entered: 02/26/1999) |
| 03/15/1999 | 7 | NOTICE of Appearance for Joseph Shereshevsky by Attorney Meir Moza (rag) (Entered: 03/24/1999) |
| 03/15/1999 | 8 | Order of advice of penalties and sanctions as to Joseph Shereshevsky (rag) (Entered: 03/24/1999) |
| 03/30/1999 | 9 | Rule 40 Documents as to Joseph Shereshevsky received from Eastern District of Virginia (mr) (Entered: 03/30/1999) |
| 03/10/2000 | 10 | SEALED DOCUMENT as to Joseph Shereshevsky (da) (Entered: 03/13/2000) |
| 06/18/2002 | 11 | FILED JUDGMENT IN A CRIMINAL CASE. (For offenses committed on or after November 1, 1987). The defendant Joseph Shereshevsky (1) pleaded guilty to count(s) 1. Imprisonment: Time served. Defendant advised of his right to appeal. Supervised release: 24 months. Special assessment: $50, due in full immediately. The drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. THe defendant shall not possess a firearm. Judgment and Commitment issued to U.S. Marshal. Docketed as a judgment #02,1191 on 6/26/02. ( Signed by Judge Charles S. Haight ) (ph) Modified on 07/01/2002 (Entered: 06/26/2002) |
| 08/06/2002 | 12 | Filed Memo-Endorsement on letter: by Joseph Shereshevsky, from Attorney Martin J. Siegel, Dated 8/1/02, addressed to: Judge Haight Re: requesting permission for the defendant to travel without restriction during the period of his supervised release, to Travel without restriction, during the period of his supervised release ...Judge memo-endorsed: SO ORDERED. ( Signed by Judge Charles S. Haight on 8/2/02). (ph) (Entered: 08/07/2002) |

| 08/08/2002 | 13 | TRANSCRIPT of record of proceedings as to Joseph Shereshevsky for dates of 6/18/02, before Judge Charles S. Haight . (gf) (Entered: 08/08/2002) |
| 06/25/2003 | 14 | MEMORANDUM AND ORDER as to Joseph Shereshevsky, Deft Shereshevsky is ordered to make restitution to Emigrant in the amount of $38,797.90. The Probation Dept will supervise the manner in which this amount will be paid. So Ordered. ( Signed by Judge Charles S. Haight ); (ac) (Entered: 06/27/2003) |
| 09/29/2003 | 15 | Filed Memo-Endorsement on letter: by Joseph Shereshevsky, from Attorney Martin J. Siegel, Dated 9/25/03, addressed to: Judge Haight Re: requesting that the defendant be permitted to travel to Europe from 9/30/03 to 10/5/03, granting permission for the defendant to Travel...Judge memo-endorsed. This application is granted, but the releasee is cautioned that in the future he must obtain an advance expression of consent (or absense of objection) from his superviising Probation Officer. So ordered. ( Signed by Judge Charles S. Haight ); (ph) (Entered: 10/01/2003) |
| 10/15/2003 | 16 | Filed Memo-Endorsement on letter: by Joseph Shereshevsky , from Martin J. Siegel, Dated October 10, 2003, addressed to: Judge Haight Re: To Travel, to Travel to Europe for the period of October 14 for one week Judge's Memo-endorsed... SO ORDERED , ( Signed by Judge Charles S. Haight ); (jw) (Entered: 10/16/2003) |
| 10/24/2003 | 17 | FILED AMENDED JUDGMENT IN A CRIMINAL CASE: (For offenses committed on or after November 1, 1987). The defendant Joseph Shereshevsky pleaded guilty to count 1. Defendant's attorney: Martin J. Siegal. Imprisonment: Time served. Defendant notified of his right to appeal. Supervised release: 24 months. Special assessment: $50. ( Signed by Judge Charles S. Haight ) Docketed as a judgment #02, 1191 on 10/27/03. (ph) Modified on 10/28/2003 (Entered: 10/27/2003) |
| 02/15/2005 | 18 | SATISFACTION OF JUDGMENT as to Joseph Shereshevsky, in the amount of $38,847.90. Judgment satisfied on 2/15/05. (ja, ) (Entered: 03/04/2005) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 07/24/2008 13:29:16 | | | |
| PACER Login: | ps1091 | Client Code: | nizan |
| Description: | Docket Report | Search Criteria: | 1:94-cr-00248-CSH Starting with document: 1 Ending with document: 9999 |
| Billable Pages: | 2 | Cost: | 0.16 |

# APPEARANCE BOND
## FOR THE

74 Cr 248 CSH

# United States District Court

SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | APPEARANCE BOND FOR NO. |
| vs. | |
| Joseph Shereshevsky | |

U.S. DISTRICT COURT
FILED
MAY 5 1994
S. D. OF N.Y.

*Non-surety* ☒ I, the undersigned defendant, acknowledge that I and my . . .
*Surety:* ☐ We, the undersigned, jointly and severally acknowledge that we and our . . .

personal representatives, jointly and severally, are bound to pay to the United States of America the sum of $ 50,000

*(describe other security)* a sum not exceeding 10% of the amount of bond.

The conditions of this bond are that    Deft. allowed to travel abroad subject to weekly reporting to Pretrial service by phone, co-signed by mother Chana Shereshevsky by 5/6/94

**The defendant is to appear** in the

United States District Court for the    SOUTHERN    District of    NEW YORK    at

**40 Foley Square** , and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in the above entitled matter as may be given

or issued by    the United States District Court for the    SOUTHERN    District of    NEW YORK or any other United States District Court to which the defendant may be removed or the cause transferred; that the defendant is not to depart the    SOUTHERN/Eastern    District of    NEW YORK    , or the jurisdiction of any other United States District Court to which the defendant may be removed or the cause transferred after he has appeared in such other district pursuant to the terms of this bond, except in accordance with such orders or warrants as may be issued by the magistrate or the United States District Court for the    SOUTHERN    District of    NEW YORK    or the United States District Court for such other district; that the defendant is to abide any judgment entered in such matter by surrendering himself to serve any sentence imposed and obeying any order or direction in connection with such judgment as the court imposing it may prescribe.

If the defendant appears as ordered and otherwise obeys and performs the foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, payment of the amount of this bond shall be due forthwith. Forfeiture of this bond for any breach of its conditions may be declared by any United States District Court having cognizance of the above entitled matter at the time of such breach and if the bond is forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States District Court against each debtor jointly and severally for the amount above stated, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and by other laws of the United States.

3/15/99
$50,000.00 PRB COSIGNED BY 2 FRP'S; AND SECURED BY $1,500.00; SURRENDER OF ALL TRAVEL DOCUMENTS, TRAVEL RESTRICTED TO USA; PSA; ( MOTHER NEED NOT SIGN AGAIN ); WITH THE CONSENT OF THE GOVT DEFT MAY BE RELEASED TODAY AND MAY HAVE UNTIL 4:30 TOMORROW TO POST THE CASH SECURITY AND TO OBTAIN THE SECOND COSIGNER. SO ORDERED USMJ BUCHWALD

¹ Where no deposit is required, delete the remainder of this paragraph.
² Where no sureties are required, indicate full amount of cash deposited in registry.
³ If a form of security other than cash is deposited, describe.
⁴ If the amount ordered to be paid exceeds 10 percent of the bond, delete.
⁵ Insert place.

DEFT
ADDRESS 88 Forest Drive #23
Newport News, VA
231___

2

CASE NUMBER 94 Cr 248 (CSH

DEFENDANT Joseph
Sheresnevsky

AS TO CO - SIGNERS:

X _____    ADDRESS: 83-20 141 St BRIARWOOD NY
        Anron Cohen                              11435

X _____    ADDRESS: _____

X _____    ADDRESS: _____

X _____    ADDRESS: _____

X _____    ADDRESS: _____

X _____    ADDRESS: _____

X _____    ADDRESS: _____

X _____    ADDRESS: _____

SIGNED AND ACKNOWLEDGED BEFORE ME ON THIS 16 DAY OF Mar 19 99

DATE: 3/16/99

BY ORDER OF THIS COURT

X Vincent J Bab
        DEPUTY CLERK

X _____
        AUSA

ORIGINAL
RECEIPT FOR PAYMENT
UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF NEW YORK

E 340033

at

RECEIVED FROM  *Amnon Cohen*
*USA - V - Joseph Shoreshesky*
*94 CR 0248 (CSH)*
*M19-1-10486 / Cash Bail*

| Fund | | |
|------|---|---|
| 6855XX | Deposit Funds | |
| 604700 | Registry Funds | |
| | General and Special Funds | |
| 508800 | Immigration Fees | |
| 085000 | Attorney Admission Fees | |
| 086900 | Filing Fees | |
| 322340 | Sale of Publications | |
| 322350 | Copy Fees | |
| 322360 | Miscellaneous Fees | |
| 143500 | Interest | |
| 322380 | Recoveries of Court Costs | |
| 322386 | Restitution to U.S. Government | |
| 121000 | Conscience Fund | |
| 129900 | Gifts | |
| 504100 | Crime Victims Fund | |
| 613300 | Unclaimed Monies | |
| 510000 | Civil Filing Fee (½) | |
| 510100 | Registry Fee | |

03/16/99 12:04PM 001#1177       8

#604700                    $1500.00
CASH                     $1500.00

Checks and drafts are accepted subject to col-
lection and full credit will only be given when the
check or draft has been accepted by the financial
institution on which it was drawn.

| DATE | | Cash | Check | M.O. | Credit | |
|------|---|------|-------|------|--------|---|
| | 19 | | | | | DEPUTY CLERK |